237 N.J. Super. 328 (1989)
568 A.2d 59
BENDIX CORPORATION, PLAINTIFF-APPELLANT,
v.
DIRECTOR, DIVISION OF TAXATION, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued May 22, 1989.
Decided October 19, 1989.
*329 Before Judges DEIGHAN, BAIME and D'ANNUNZIO.
Mark S. Rattner argued the cause for appellant (Riker, Danzig, Scherer, Hyland & Perretti, attorneys; Mark S. Rattner, of counsel and on the briefs).
Mary R. Hamill, Deputy Attorney General, argued the cause for respondent (Cary Edwards, Attorney General, attorney; James J. Ciancia, Assistant Attorney General, of counsel; Mary R. Hamill, on the brief).
The opinion of the court was delivered by D'ANNUNZIO, J.A.D.
Bendix Corporation (Bendix) appeals a Tax Court judgment affirming a Division of Taxation decision to add three income items to Bendix's income for its fiscal year which ended September 30, 1981. Bendix Corp. v. Taxation Div. Director, 10 N.J. Tax 46 (1988). The three items are:
(1) a $211.5 million capital gain from Bendix's sale of 20.6% of the outstanding stock of Asarco, Inc. (Asarco);
(2) a $41.9 million capital gain from Bendix's sale of 100% of the outstanding stock of United Geophysical Corporation (UGC); and
(3) $3.4 million interest Bendix earned on the proceeds of the Asarco and UGC stock sales.
The addition of these items increased Bendix's tax base under New Jersey's Corporation Business Tax Act (1945), N.J.S.A. 54:10A-1 et seq., and, therefore, increased Bendix's tax.

*330 I. BASIC FACTS
The facts are not in dispute as the case was tried on stipulated facts and exhibits and a deposition of W.M. Agee, a former Bendix chief executive.
During the tax year in question, Bendix was a Delaware corporation, incorporated in 1929, with its principal office in Michigan. Bendix commenced business as a manufacturer of aviation and automotive parts. By 1981 Bendix was a multinational corporation operating directly or through subsidiaries in all 50 states and 22 other countries, and its business had expanded beyond basic aviation and automotive business to include four major operating groups: (a) automotive; (b) aerospace/electronics; (c) industrial energy; (d) forest products.
In 1981, Bendix operated several units of its aerospace group in Teterboro, New Jersey, and manufactured electric generating systems in Eatontown, New Jersey. In addition, a wholly-owned subsidiary, Bendix's Field Engineering Corporation, provided ocean current, weather and other information worldwide to the trans-oceanic shipping industry through its Marine Science Services Division in Teterboro and provided facilities management and support services to an Environmental Protection Agency facility in Edison, New Jersey. Bendix sold its full range of products and services to New Jersey customers and stored inventory in New Jersey.
Bendix acquired 20.6% of Asarco's outstanding stock between December 1977 and November 1978. Asarco mined and produced copper, lead, zinc, silver and other non-ferrous metals, as well as asbestos and coal, in Latin America and other countries. See ASARCO Inc. v. Idaho State Tax Comm'n., 458 U.S. 307, 102 S.Ct. 3103, 73 L.Ed.2d 787 (1982) for a more detailed description of Asarco's activities. As a result of its equity position in Asarco, two Bendix executives became members of Asarco's 14-member board of directors. Asarco contributed $.82 a share to Bendix's 1979 earnings of $7.10 a share, and $2.22 a share to Bendix's 1980 earnings of $7.68 a share.
*331 In late 1980, Bendix decided to sell its Asarco stock because it had appreciated considerably and Bendix had decided to reduce its position in the natural resource business. The sale yielded three times Bendix's initial investment.
In 1965, Bendix purchased all of the stock of United Geophysical Corporation (UGC). UGC performed seismic surveys for the oil and gas industry. UGC transacted no business in New Jersey. Bendix employees managed UGC through service on UGC's board or as UGC corporate officers. Bendix approved UGC's annual financial plans, its major capital expenditures and financed the construction of two ships to be used by UGC in marine seismic exploration.
In 1980, Bendix took advantage of an opportunity "to divest UGC at a very favorable price" and sold all of the UGC stock for $80 million, yielding a $41.9 million capital gain.
In 1981, Bendix placed the proceeds of the Asarco and UGC sales in an interest bearing investment account outside New Jersey. The investments generally carried maturities of less than 90 days and generated $3.4 million interest during fiscal 1981.
Bendix contends that New Jersey's inclusion of the Asarco and UGC capital gains in the corporate business tax base was an unconstitutional taxing of extra-territorial values.

II. PRINCIPLES OF LAW
A state may look beyond its borders in taxing the property of foreign corporations to allow it to
get the true value of the things within it, when they are part of an organic system of wide extent, that gives them a value above what they otherwise would possess. [Wallace v. Hines, 253 U.S. 66, 69, 40 S.Ct. 435, 436, 64 L.Ed. 782 (1920)].
This principle was applied in Bass, Ratcliff & Gretton v. State Tax Commission, 266 U.S. 271, 45 S.Ct. 82, 69 L.Ed. 282 (1924), to uphold a New York franchise tax imposed on an English brewer.

*332 So in the present case we are of the opinion that, as the Company carried on the unitary business of manufacturing and selling ale, in which its profits were earned by a series of transactions, beginning with the manufacture in England and ending in the sales in New York and other places ... the state was justified in attributing to New York a just proportion of the profits earned by the Company from such unitary business. [Id. at 282, 45 S.Ct. at 84].
Because the taxpayer's New York activities were part of the "unitary business" of brewing and marketing ale, New York taxing authorities were permitted to measure the tax base by all of the taxpayer's worldwide income. This base was then apportioned to New York by the proportion the value of the taxpayer's New York property bore to the total value of all the taxpayer's property ($44,117/$3,501,483).
The unitary business principle was considered recently by the United States Supreme Court in a series of cases beginning in 1980. In Mobil Oil Corp. v. Commissioner of Taxes, 445 U.S. 425, 100 S.Ct. 1223, 63 L.Ed.2d 510 (1980), the Court upheld Vermont's inclusion in Mobil's tax base of dividends Mobil received from its subsidiaries and affiliates doing business abroad. Mobil was a New York corporation which marketed petroleum products in Vermont. Mobil had no production or refining facilities in Vermont.
The Court stated the general principle that to tax income generated in interstate commerce Due Process requires a minimal connection between the interstate activities and the taxing state, and a rational relationship between the income attributed to the state and the intrastate values of the enterprise. The Court ruled that Mobil failed to establish that the income was earned in the course of activities unrelated to the sale of petroleum products in Vermont. It was satisfied that the foreign activities were part of Mobil's integrated petroleum enterprise.
So long as dividends from subsidiaries and affiliates reflect profits derived from a functionally integrated enterprise, those dividends are income to the parent earned in a unitary business. One must look principally at the underlying activity, not at the form of investment, to determine the propriety of apportionability. [Id. at 440, 100 S.Ct. at 1233.]
*333 In Exxon Corp. v. Wisconsin Dept. of Revenue, 447 U.S. 207, 100 S.Ct. 2109, 65 L.Ed.2d 66 (1980), the Court rejected Exxon's argument that its maintenance of three discrete departments for Exploration/Production, Refining and Marketing, each with separate financial accounts, required the exclusion of non-marketing income from its Wisconsin tax base.
Mobil and Exxon involved vertically integrated economic units. ASARCO Inc. v. Idaho State Tax Commission, supra, involved dividend and interest income from corporations in which Asarco owned major interests but which engaged in the same business as Asarco, the mining and production of non-ferrous metals. Although there was some movement of product between Asarco and the subsidiaries, the corporate relationships more closely resembled a horizontal combination. Asarco's stock interests in the five subsidiary corporations ranged from 34% to 53%.
Silver mining was Asarco's principal Idaho activity, although it mined and sold other Idaho minerals and operated its northwest mining division's administrative office in Idaho. Only 2.5% of Asarco's total business activity occurred in Idaho. The subsidiaries were not active in Idaho.
The Court rejected Idaho's contention that income from intangible property is part of a unitary business if it contributes to or furthers the taxpayer's business.
This definition of unitary business would destroy the concept. The business of a corporation requires that it earn money to continue operations and to provide a return on its invested capital. Consequently all of its operations, including any investment made, in some sense can be said to be "for purposes related to or contributing to the [corporation's] business." When pressed to its logical limit, this conception of the "unitary business" limitation becomes no limitation at all. [Id., 458 U.S. at 326, 102 S.Ct. at 3114.]
The Court applied a similar rationale to defeat the inclusion of a subsidiary's dividend in F.W. Woolworth Co. v. Taxation & Rev. Dept. 458 U.S. 354, 102 S.Ct. 3128, 73 L.Ed.2d 819 (1982). Three of the subsidiaries were wholly owned; Woolworth owned 52% of the fourth subsidiary. Each subsidiary operated in a different country outside the United States, and each was *334 in the same business as the parent, chainstore retailing of a variety of consumer goods. There was no centralized management and each subsidiary enjoyed business autonomy.
Asarco and F.W. Woolworth cast a dark shadow over the Tax Court's decision in the present case. However, their precedential value was weakened by the Court's subsequent decision in Container Corp. of America v. Franchise Tax Board, 463 U.S. 159, 103 S.Ct. 2933, 77 L.Ed.2d 545 (1983). Moreover, Asarco and Woolworth, like Mobil and Exxon, were single-industry companies, unlike Bendix.
Container Corporation of America (hereafter Container Corp.) was a vertically integrated manufacturer of paperboard packaging operating in the United States. It was a Delaware corporation headquartered in Illinois, and did business in California, the taxing state. Container Corp. controlled 20 foreign subsidiaries, located in Latin America and Europe, through stock ownership ranging between 66% and 100%. For the most part, these subsidiaries were fully integrated paperboard manufacturers enjoying autonomy "with respect to matters of personnel and day-to-day management." Id., 463 U.S. at 172, 103 S.Ct. at 2943. No more than 1% of the subsidiaries' material purchases were from Container Corp.
The Court reaffirmed the unitary business principle, but, despite substantial similarities with the facts in Asarco and F.W. Woolworth, the Court upheld the inclusion of the subsidiaries' income in Container Corp.'s franchise tax base. The Court distinguished Asarco and F.W. Woolworth in the following terms:
The state Court of Appeal relied on a large number of factors in reaching its judgment that appellant and its foreign subsidiaries constituted a unitary business. These included appellant's assistance to its subsidiaries in obtaining used and new equipment and in filling personnel needs that could not be met locally, the substantial role played by appellant in loaning funds to the subsidiaries and guaranteeing loans provided by others, the "considerable interplay between appellant and its foreign subsidiaries in the area of corporate expansion," ... the "substantial" technical assistance provided by appellant to the subsidiaries, ... and the supervisory role played by appellant's officers in *335 providing general guidance to the subsidiaries. In each of these respects, this case differs from ASARCO and F.W. Woolworth, and clearly comes closer than those cases did to presenting a "functionally integrated enterprise," ... which the State is entitled to tax as a single entity. We need not decide whether any one of these factors would be sufficient as a constitutional matter to prove the existence of a unitary business. Taken in combination, at least, they clearly demonstrate that the state court reached a conclusion "within the realm of permissible judgment." [Id. at 179-180, 103 S.Ct. at 2947-2948; citations and footnotes omitted.]
The Court recognized that application of the unitary business principle was excruciatingly fact sensitive, and as long as the correct legal standard was applied, the Court limited its role to determining whether the state court's judgment "was within the realm of permissible judgment." Id. at 176, 103 S.Ct. at 2946. The Court cautioned, however, that "the mere flow of funds arising out of a passive investment or a distinct business operation," id. at 166, 103 S.Ct. at 2940, was not enough to relate a taxpayer's out-of-state activities "in some concrete way to the in-State activities." Ibid. What is required is "some sharing or exchange of value not capable of precise identification or measurement ... which renders formula apportionment a reasonable method of taxation." Ibid.

III. THE TAX COURT'S DECISION
The Tax Court in the present case distinguished between capital gains from the sale of an interest in a subsidiary corporation and dividends paid by a subsidiary. According to the Tax Court, in a capital gains context, such as this case, the focus must be on Bendix's income and activities, and not on how Asarco or UGB earned its income. "The activities in issue are investment activities, and the unitary business question is resolved ... by examining taxpayer's activities in managing the investment, not the nature of the activities of the subject of the investment." 10 N.J. Tax at 59. After examining Bendix's involvement in Asarco, the Tax Court concluded that Due Process did not preclude inclusion of the Asarco capital gain in Bendix's tax base because Bendix's Asarco investment was "a significant part of the Bendix corporate strategy." Ibid.

*336 The purchase of a minority share in Asarco was part of a Bendix plan for growth and diversification in the 1980's which called for investing in depressed and undervalued basic resources to achieve the planned result of a stronger, diversified company. This investment was made only after a thorough analysis of the copper industry and the qualities of specific acquisition candidates. The Asarco investment was part of a well-orchestrated corporate strategy designed to enhance Bendix's current status, as well as position Bendix for the future. To describe this investment as passive would ignore the New Jersey Supreme Court's decision in Silent Hoist and disregard economic reality. The determination of the New Jersey Supreme Court in Silent Hoist has set the course for this court to follow. [10 N.J. Tax at 59-60.]
Silent Hoist & Crane v. Taxation Div. Director, 100 N.J. 1 (1985), heavily relied upon by the Tax Court in this case, involved a New York corporation with its principal place of business in New York. It sold cranes in New Jersey, but its manufacturing plant was in New York. It also owned two commercial properties in New Jersey and had passive investment income. The Supreme Court reversed a Tax Court decision that the taxpayer's investment, real estate and sales businesses were distinct business enterprises and should not be taxed as a unitary business.
Although we do not fully subscribe to the legal significance attached to the distinction between dividends and capital gains, and despite the obvious factual differences between Silent Hoist, a one-man corporation, and the present case, we agree in general with the Tax Court's approach. By 1981 Bendix had developed beyond its root business of manufacturing aviation and automotive equipment to become a diversified international corporation. The Tax Court's opinion recognized that by 1981 Bendix was committed to a corporate strategy of international diversified growth. The record establishes that Bendix acquired assets based on their fit within the framework of existing Bendix operations and their utility as stepping stones to additional acquisitions, and not merely for their capacity to generate income.

IV. THE RECORD IN DETAIL
As previously indicated, the Tax Court decided this case on a stipulation of facts, the stipulated deposition of W.M. Agee *337 (Agee), Bendix's CEO from January 1977 to June 1983, and on stipulated exhibits. The factual stipulation consists of 165 numbered paragraphs totaling 45 pages. The exhibits, lettered A through U, total 370 pages. Agee's deposition is 123 pages. The Tax Court's opinion referred only to the basic facts. Some of the details give a much better picture of Bendix and its goals.
Bendix maintained a planning department which "considered, analyzed and developed long and short range business proposals ..." Stip., para. 27.
Consistent with this objective, the planning department would analyze trends in the types of businesses Bendix was engaged in and ways to respond to those trends such as (i) increasing or decreasing capital commitment to particular products or services, (ii) greater or lesser expenditures by Bendix on research and development as to particular products or services, (iii) offering new or discontinuing (by divestiture of subsidiaries or other operating units or otherwise) existing Bendix products or services, or (iv) entry into a new product or service area either by developing the new product or service from within or by acquiring the assets, employees or technology for that new product or service through acquisition. The Bendix planning department, as the need arose, also evaluated acquisition candidates. While acquisition or divestiture was not the sole means of accomplishing certain of the above-mentioned objectives, Bendix, as many other major corporations, engaged in selected acquisitions and divestitures of companies or assets over the years. [Stip., para 27; Emphasis supplied.]
28. As described by A. Matthew Lord, Director of Corporate Development in the Bendix planning department, during his tenure in the planning department (1975-1982) Bendix had three major strategies for growth: (1) exploit its existing businesses, (2) move into related areas, and (3) move into unrelated areas with strong growth potential. [Stip., para. 28.]
In the late 1970's Bendix turned its attention, in part, to the acquisition of a natural resource company. On March 31, 1978, Agee addressed a lengthy memorandum to Bendix's Long Range Planning Committee entitled Long Range Growth and Acquisition Planning. (Exhibit E.) Initially, Agee defined some corporate goals for the next decade.
We believe ourselves to be strong enough financially and managerially to warrant several major moves aimed at growth and diversification for the 80's.
. Growth and diversification in the Industrial/Energy area.
. Growth and rebalancing in the forest products area.

*338 . Investment in other basic resources that are now depressed and undervalued but that offer strong profit possibilities for the 80's.
. Restructuring of Bendix Home Systems with a view to possible withdrawal in the next few years.
Agee then described the potential impact of attaining these goals:
These actions might slow down somewhat the growth in our near-term earnings. But we would be building towards rapid growth in earnings in the early 80's.
We would be tilting our activities in the directions that may, on the whole, make us somewhat more cyclical than we have been but with compensating higher growth.
We would be well able over the period to keep our balance sheet within the 65/35 ratio that is so important for us. Each major acquisition would be structured to leave us positioned financially to take the next action.
We would probably face a significant increase in goodwill from acquisitions, but it is not entirely clear that this is so.
We would have no trouble in maintaining our growth in dividends.
The program that we have in mind would require some significant increase in our total capitalization. Part of this would come about in any case because we will generate an annual increase in net worth averaging approximately $100 million over the next five years. Leveraging this to the 2:1 debt ratio with which we are comfortable permits an increase in capitalization of over $300 million in the next two years and well over $750 million over 5 years. The use of preferred securities for acquisitions would, of course, strengthen our equity base thus permitting further debt. The sale of common stock is also open to us.
These observations underscored the interdependence of Bendix's existing businesses and long-term strategic planning. Agee also noted the positive relationship between acquisitions and growth "If we are to find strong growth in the 80's, acquisitions must be made. As noted before, we have the financial means for doing so." One of the acquisitions discussed in Agee's memorandum is that of Asarco, referred to by the code name Blackie. Agee expressed interest in acquiring a mining company "because we are bullish on basic resources for the balance of the century."
Agee's memorandum described Blackie and discussed alternative methods of acquisition from a purchase of 100% of its stock to acquiring a 20% interest which would permit earnings consolidation. Agee expressed a preference for the 20% position *339 because financially it was more manageable and would give Bendix "time to become more familiar with the company and the industry before chancing a significantly larger position." [Emphasis supplied.] Moreover,
On the matter of control. It does not follow that our influence in the company is only nominal because we would lack 51%. If we were to enjoy a good relationship with Blackie  with a seat or two on the Board  our influence could be felt. Much would depend, of course, on whether Blackie resisted or accepted our presence  about which more is said later. Even if it initially resisted, in due course it could come around to accept if not welcome our presence and advice.
....

Assuming success, what would happen next? We would organize ourselves to form a shadow group here to learn as much as we can about the company and the industry. If our nominees entered Blackie's Board, we would gain access to insider information which could inhibit but not bar further acquisition of shares. Within a time that cannot now be defined, we would decide on whether to enlarge or sell our holdings and, if so, how to do so. It is our intention not to let the matter dawdle. [Emphasis supplied.]
Agee's memorandum was followed by his April 12, 1978 recommendation to Bendix's Board of Directors that Bendix acquire up to 20% of Asarco's stock. Agee expressed the following reasons for his recommendation:
This acquisition clearly will aid us in our acquisition strategies whose purposes are:
. Reducing our dependence on the relatively slow-growing aerospace and automotive OEM market.
. Broadening our Industrial/Energy Group to give it size and better definition.
. Generating good cash flow in the early 1980's to meet growing capital needs, particularly in aerospace/electronics to permit it to hold its own in stiffening markets.
. Broadening our holding in basic commodities, particularly forest products and in non-fuel minerals that should prosper from the energy problem or which have other reasons for strong market position in the 1980's.
ASARCO clearly meets the last objective. We have actively in mind acquisitions in the forest products and industrial areas which we hope to bring to the Board in the not too distant future.
The Board approved the recommendations. Bendix paid $127,649,017 for the stock. It borrowed $110 million and paid the balance with internally generated cash.
*340 In September 1979, Agee, with the approval of Bendix's Board, proposed a merger of Bendix and Asarco. Asarco's Board of Directors resisted and the matter was not pursued.

V. BENDIX ACQUISITION HISTORY
Bendix's Asarco acquisition was not an isolated event. It was part of a long-range acquisition policy described in paragraphs 130-153 of the stipulation.
In 1966, Bendix acquired seven companies, including one which produced medical electronics equipment for physicians and a company which produced fiber optics. Bendix acquired five companies in 1967 and five companies in 1968.
Bendix's 1969 Annual Report to Shareholders stated:
Recognizing the vital necessity to broaden the base of our business so as to be less dependent on the government sector, we intensified our efforts to expand in other commercial and industrial markets.
........
Acquisitions have played a significant role in the growth of your corporation during the past decade.
Bendix made six acquisitions in 1969, including the Skagit Corporation which was involved in "logging equipment and systems and other handling equipment." Paragraph 130 of the stipulation describes the Skagit acquisition as "an acquisition in business areas in which [Bendix] had no existing specific involvement."
In 1970, Bendix merged with American Forest Products Corporation, which was described as Bendix's largest acquisition to date and "represented a new market for Bendix." American Forest Products Corporation was in the timber management, lumber, building materials, wood and corrugated containers, and aluminum siding businesses.
Bendix acquired six "relatively small" companies in 1971 and acquired a 50% interest in two European companies.
The 1972 Annual Report to Shareholders included a statement by Bendix's chairman that Bendix was pursuing "broad *341 corporate strategies to further increase the non-government segment of our business, to pursue the diversification of our major lines of business, to expand our role in non-cyclical or counter-cyclical markets and to increase our international involvement."
In 1973, Bendix acquired Boise Cascade's International Mobile Home and Recreational Vehicle businesses, reorganizing them as Bendix Home Systems. The 1973 Annual Report to Shareholders stated that Bendix "continued our policy of disposing of minor operations which do not relate to our long-range business strategy."
The 1976 Annual Report noted that Bendix's earning record in the 50's and 60's was "spotty" because of dependence on government work and on "the cyclical ups and downs of the industries [Bendix] served."
The 1977 Annual Report stated that "we have pursued a deliberate policy of diversification both within and among our lines of business, and geographically as well, in an effort to arrive at a combination of activities that helps insulate the company as a whole from the ups and downs of any one of them." [Emphasis supplied.] This theme was repeated in the 1978 Annual Report in which the chairman noted that Bendix has "successfully pursued a strategy of diversification which has brought us resistance to the ill effects of swings in the business cycle. First, we are in four major businesses: automotive, aerospace-electronics, forest products and industrial-energy. Second, within each of these, we are all diversified."
This brief history demonstrates an acquisition policy focused, in part, upon diversification designed to reduce reliance on government work and to moderate the business cycle's impact. Bendix's Asarco acquisition was consistent with and furthered this policy and the record supports a finding, implied in the Tax Court's decision, that Bendix's unitary business included implementation of this policy of acquiring interests in diverse industries to achieve the goals of growth, *342 cyclical protection and corporate balance. But see, James v. International Telephone and Telegraph Corp., 654 S.W.2d 865 (Mo. 1983), which rejected a similar unitary business analysis.
A similar analysis applies to UGC. Morever, Bendix owned 100% of UGC and was directly involved in its management, capital financing and operations.
For the reasons above stated, we conclude that the capital gains earned from the sales of Asarco and UGC stock were properly included in Bendix's New Jersey tax base.
The Tax Court's inclusion in the tax base of the interest Bendix earned on the sale proceeds and the Tax Court's rejection of Bendix's attack on the allocation formula are affirmed for the reasons expressed by the Tax Court.