The opinion of the court was delivered by
LASSER, P.J.T.C.
Plaintiff, International Paper Company (“IP”), contests the Director’s denial of refund claims for corporation business tax paid for tax years 1981 and 1982. IP contends that two items of income are not properly includable in its “adjusted entire net income” because this income was not earned as part of IP’s unitary business. The items of income at issue are:
*151 (1) the capital gain and interest income realized by IP on the sale of all of its stock ownership in Canadian International Paper Company (“CIP”); and
(2) the capital gain income realized by IP on the sale of its stock in C.R. Bard, Inc. (“Bard”).
Plaintiff alleges that inclusion of this income is violative of the Due Process and Commerce Clauses of the United States Constitution.
The facts of the case have been stipulated, and the case has been submitted to the court on oral argument pursuant to R. 8:8-1(b). This is a full court opinion pursuant to R. 8:8-6.
I

The Companies.

A.

International Paper Company.

IP is a corporation organized under the laws of the State of New York, with its principal office and corporate headquarters in Purchase, New York. IP transacts business in more than 35 states, including New Jersey. During the years 1980-1982, IP owned, maintained and operated a computer center in Denville, New Jersey, and a sales office for its container division in Cedar Knolls, New Jersey. IP is engaged principally in the manufacture and sale of products in three industry segments (shown with percentages of total sales for the years 1977-1981): (i) pulp and paper (31-34%),[1] (ii) packaging and packaging materials (45-50%)[2] and (iii) wood products and resources (18-21%).[3] Through the use of approximately 100 subsidiary corporations, IP is also engaged in other diverse businesses, inelud *152 ing the development of mineral properties, the operation of a contract oil and gas drilling business and the management of agricultural operations.
B.

Canadian International Paper Company.

CIP, prior to its sale in 1981, was a wholly-owned subsidiary of IP, incorporated in the Province of Quebec, maintaining its corporate headquarters in Montreal, Canada. In 1981, CIP was the largest newsprint producer in the world. CIP and its subsidiaries are engaged in production and sale in the following industry segments (shown with percentages of total sales for the years 1977-1981): (i) pulp and paper (62-66%),[4] (ii) packaging products (21-23%),[5] and (iii) other products (14-18%).[6] It was stipulated that CIP does not transact any business in New Jersey.
CIP and IP had frequent business transactions with each other. CIP sold packaging paperboard and linerboard or rollstock to IP for use in IP’s container plants. IP sold linerboard, fine paper, newsprint and liquid packaging to CIP. All sales between the two companies were at competitive wholesale prices. In addition to transactions between them, each company also sold products to, and purchased products from, independent third parties. CIP subsidiaries also purchased wood supplies from IP. Another subsidiary of IP, International Pulp Sales (“IP Pulp Sales”), acted as a distributor for CIP and its subsidiaries on a resale basis, and IP Pulp Sales also acted as a distributor for IP on a resale basis. A subsidiary of CIP, *153 International Paper Sales Company (“CIP Paper Sales”) acted as a United States distributor of substantially all of the newsprint produced by IP. The same subsidiary also distributed newsprint in Canada and abroad for CIP on a resale basis. Both IP Pulp Sales and CIP Paper Sales also transacted business with independent third parties. Another IP subsidiary, International Navigation Limited (“IP Navigation”), provided marine transportation services to CIP Paper Sales for transport of newsprint from Canada to the United Kingdom.
Other agreements between CIP and IP made CIP a selling agent for IP kraft board and fine paper and the exclusive selling agent in Canada for a line of IP packaging machinery. Under these agreements CIP received a sales commission.
The chairman and vice chairman of the board of directors of IP also served as the chairman and vice chairman of CIP’s board. The remaining ten members of the CIP board of directors were not affiliated with IP. IP required CIP to submit the following capital expenditure requests to IP for approval: (1) the proposed operating budget and (2) commitments exceeding $5 million. Commitments between $1 million and $5 million required approval by IP’s chairman and vice chairman. From 1971 to 1981, two former IP executives served consecutively as president of CIP.
The two companies generally developed separate employment policies and plans. Although IP’s profit improvement plan and incentive compensation plan extended to all of the IP subsidiaries, CIP established its own plans which awarded IP stock to CIP employees. IP agreed to sell such stock to CIP for use in these plans. IP also maintained joint liability insurance for the directors and officers of IP and CIP and benefit plans for certain key CIP employees.
As an IP subsidiary, CIP was subject to the IP “Corporate Policy Guide,” which provided general guidelines on a variety of subjects including law, accounting, environmental policy, employment policy and ethics. However, this guide was not intended to supersede the existing policies and procedures of *154 CIP, and CIP’s own administrative manual covered many of the same topics.
Each company maintained separate computer facilities and legal and accounting staffs; however, IP did provide certain patent and tax advice to CIP free of charge. After 1970, each company maintained its own research department or research subsidiary and contracted for the licensing and exchange of technology with each other. Although the two companies did not generally share facilities or equipment, a subsidiary of CIP did lease office space from IP. CIP and IP each owned a conference facility which was available to the other for a fee. A “tie-line” telecommunication system provided a direct dedicated telephone link between IP and CIP.
CIP accountants provided IP with the information necessary to prepare IP’s consolidated financial statements, which included CIP’s financial data. No overhead attributable to IP or CIP was allocated or apportioned to the other for any purpose. CIP did not issue its own annual reports.
In 1981, CIP’s long term outstanding indebtedness to IP amounted to $200,000 (approximately 1% of CIP’s long term debt). This debt was issued at the then existing market rate. Prior to 1981, IP and CIP obtained separate and independent debt financing from Metropolitan Life Insurance Company.
On October 1, 1981, IP sold all of its shares of CIP to Canadian Pacific Enterprises for $896 million, which was to be paid in two installments. As a condition to the closing of the sale, IP was required to cause IP Navigation to assign to a CIP subsidiary all of the IP Navigation leases of vessels used by IP Navigation to provide transportation services to CIP Paper Sales. The sale resulted in a pretax gain to IP of $534,884,565. IP also received $24,250,570 in interest income on the second installment, which was divided between IP’s 1981 and 1982 federal tax returns.
The proceeds of the sale were transferred to International Paper Investment Company, a wholly-owned subsidiary of IP. *155 Some of those proceeds were eventually used to renovate IP’s mills and plants.
Business dealings between IP, IP subsidiaries and CIP continued after the 1981 sale. IP Pulp Sales continued to market CIP Pulp. CIP, Inc., which succeeded CIP Paper Sales after the sale, continued to market IP’s newsprint. CIP also continued to provide research information to IP on a fee basis.
C.

C.R. Bard, Inc.

IP acquired 702,000 shares of Bard in 1968 in connection with IP’s purchase of Davol Corporation, the assets of which included the Bard shares. The value allocated to the Bard shares at that time was $25,272,000. The stock later split, resulting in IP’s ownership of 1,404,000 Bard shares, which represented 14.4% of the outstanding Bard shares.
Bard is incorporated in the State of New Jersey and maintains its principal place of business in Murray Hill, New Jersey. Its stock is traded on the New York Stock Exchange. Bard’s business involves the design, packaging, distribution and sale of hospital and surgical specialties. Bard has not transacted any business with IP or its affiliates. IP and Bard share no directors, officers, employees, property or facilities. IP’s relationship with Bard has continuously been that of a shareholder. During the 1981 tax year IP received $607,899 in dividends on its Bard shares.
In November 1971, IP issued 4x/4% subordinated debentures due November 1, 1996. After certain dates, these debentures were exchangeable for Bard shares, which were deposited with an escrow agent. IP later purchased the debentures and reacquired the Bard shares. On September 22, 1982, IP sold 148,078 of the reacquired Bard shares and realized a pretax gain of $2,276,502. After the sale, IP retained approximately 12.8% of the issued and outstanding common stock of Bard.
*156 II.

Decisional Background.

New Jersey is prohibited by the Due Process and Commerce Clauses of the United States Constitution from imposing an income-based tax on “value earned outside its borders.” ASARCO, Inc. v. Idaho State Commission, 458 U.S. 307, 315, 102 S.Ct. 3103, 3108, 73 L.Ed.2d 787 (1982). To avoid such a prohibited tax on a business enterprise operating in more than one state, New Jersey applies an apportionment formula which taxes that portion of the income of the enterprise reflected by fractions in which the property, payroll and receipts in New Jersey are the numerators and property, payroll and receipts everywhere are the denominators.
The average of these fractions is an allocation factor which is applied to certain income of the enterprise. The State may apply this allocation factor to only that income of the enterprise having a “ ‘minimal connection’ or ‘nexus’ between the interstate activities and the taxing state, and a ‘rational relationship between the income attributable to the state and the intrastate values of the enterprise’.” Container Corp. of America v. Franchise Tax Board, 463 U.S. 159, 165-166, 103 S.Ct. 2933, 2940, 77 L.Ed.2d 545 (1983), quoting Exxon Corp. v. Wisconsin Dept, of Revenue, 447 U.S. 207, 219-220, 100 S.Ct. 2109, 2118, 65 L.Ed.2d 66 (1980), quoting Mobil Oil Corp. v. Commissioner of Taxes, 445 U.S. 425, 436, 100 S.Ct. 1223, 1231, 63 L.Ed.2d 510 (1980).
Many states use such a unitary business/formula apportionment method in lieu of geographic or transactional accounting. Justice Brennan, in Container, supra, stated:
The unitary business/formula apportionment method is a very different approach to the problem of taxing businesses operating in more than one jurisdiction. It rejects geographical or transactional accounting, and instead calculates the local tax base by first defining the scope of the ‘unitary business’ of which the taxed enterprise’s activities in the taxing jurisdiction form one part, and then apportioning the total income of that ‘unitary business’ between the taxing jurisdiction and the rest of the world on the basis of a formula taking into account objective measures of the corporation’s activities within and without the jurisdiction. This court long ago upheld the constitutionality of the *157 unitary business/formula apportionment method, although subject to certain constraints. [463 U.S. at 165, 103 S.Ct. at 2940; citations omitted]
The use of the unitary business/formula apportionment method of identifying income which may be taxed locally initially requires a determination as to whether the enterprise is unitary. The primary issue in this case is whether CIP and Bard should be considered part of IP’s unitary business. The unitary concept has been addressed several times by the United States Supreme Court in recent years. See Mobil Oil Corp. v. Commissioner of Taxes, supra; Exxon Corp. v. Wisconsin Dept, of Revenue, supra; ASARCO, Inc. v. Idaho State Tax Commission, supra; F. W. Woolworth Co. v. Taxation & Rev. Dept, 458 U.S. 354, 102 S.Ct. 3128, 73 L.Ed.2d 819 (1982); Container Corp. of America v. Franchise Tax Board, supra. However, these cases do not enunciate a single test to determine whether a business is unitary. Silent Hoist & Crane v. Taxation Div. Director, 100 N.J. 1, 18, 494 A.2d 775 (1985), cert. den. 474 U.S. 995, 106 S.Ct. 409, 88 L.Ed.2d 359 (1985).
Mobil involved inclusion of dividends received from foreign subsidiaries in Mobil’s tax base for purposes of taxation in Vermont. Mobil, a New York corporation headquartered in New York City, was described as a functionally integrated enterprise conducting an integrated petroleum business. Mobil owned no production facilities or refineries in Vermont. Its activities in that state were limited to the wholesale and retail marketing of petroleum and related products. Relying on the fact that Mobil was an integrated enterprise, the Court held that income from the foreign subsidiaries was properly included in Mobil’s Vermont tax base.
In Exxon, Exxon argued that its business in Wisconsin was limited to the marketing of petroleum products, and therefore, should not be taxed on its exploration and production or refining income. Like Mobil, Exxon was a vertically integrated petroleum company incorporated and headquartered outside of the taxing state. The Court rejected Exxon’s argument that separate accounting for each department distinguished this case from Mobil, 447 U.S. at 223, 100 S.Ct. at 2120, and held *158 that “Exxon has not carried its burden of showing that its functional departments are ‘discrete business enterprises’.” Id. at 224, 100 S.Ct. at 2120.
The unitary principle was somewhat limited by the decisions in ASARCO and Woolworth. In ASARCO, Idaho claimed a right to tax a proportionate share of that company’s income derived from five foreign subsidiaries. ASARCO was incorporated in New Jersey and headquartered in New York, and its business involved the mining, smelting and refining of various metals. ASARCO’s primary activity in Idaho was the operation of a silver mine which amounted to 2.5% of the company’s total activity. ASARCO owned between 34% and 53% of the shares of the subsidiaries sought to be taxed.
Although these subsidiaries were in the same line of business as ASARCO, the Supreme Court noted that ASARCO did not exercise any control over the subsidiaries and held that they were discrete business enterprises whose activities were not taxable by Idaho. In Woolworth, the Court similarly rejected the inclusion in New Mexico’s tax base of income from four foreign subsidiaries, three of which were wholly owned, which were engaged in the same business as the parent. The holding was based on a factual determination of a lack of functional integration, centralization of management and economies of scale.
The line between unitary and non-unitary was further defined in Container. Container Corporation was a Delaware corporation headquartered in Illinois and doing business in California. Container Corporation was a vertically integrated paperboard packaging manufacturer. The State of California sought to include sales from Container Corporation’s foreign subsidiaries in the three-part allocation formula. These subsidiaries were 66% to 100% owned by Container Corporation and were engaged in essentially the same business. Although Container Corporation did not take an active role in the management of these subsidiaries, the parent generally oversaw the subsidiaries’ operations and there was some overlapping of officers and directors. These factors contributed to the Court’s determina *159 tion that Container Corporation was a functionally integrated enterprise and that the subsidiaries’ income should be taxed under unitary business principles.
III.

Are International Paper and Canadian International Paper Unitary?

Taxpayer contends that the interest and capital gain income earned on the sale of stock of CIP should not be treated as income earned by a unitary business and that taxation as such violates the Due Process and Commerce Clauses of the United States Constitution. IP contends that there is a lack of functional integration, centralization of management and economies of scale. In support of these contentions, IP argues that sales between the companies were de minimis, technical assistance was not substantial, and debt financing by the parent was nominal. IP claims that the transacting of business between the two companies at competitive prices does not create the economic advantages required for a finding that the enterprises are unitary, and any other benefits derived from the relationship were insignificant. IP further claims that there is neither control nor sharing or exchange of value as required by the United States Supreme Court in Container, supra, and that case further requires a substantial mutual interdependence between the taxpayer and the issuing corporation. IP also contends that according to Container, centralization of management requires operational control, and the existence of common directors and fiscal oversight does not necessarily prove the existence of a unitary enterprise. IP also argues that there were few employee transfers between IP and CIP, and management policy control does not reach the level of Container. Rather, IP compares its situation to the occasional oversight allowed in Woolworth, supra. To support its argument that no economies of scale existed, IP points out there was no joint purchasing, sales, marketing, advertising, patents or trademarks. IP further argues that economies of scale are not present absent operational unity.
*160 The Director argues that the determination that an enterprise is unitary is highly factual, and that IP’s active, continuous and substantial involvement with CIP supports such a unitary factual finding. The Director also claims that the decision in Container requiring a “flow of value” does not require day-to-day management control.
CIP was clearly part of the unitary business of IP. Like Mobil, Woolworth and Container, this case involves a 100% owned foreign subsidiary. Unlike ASARCO and Woolworth, the taxpayer in this case can be considered a functionally integrated enterprise, and the factors which made the subsidiaries “discrete business enterprises” in those two cases are not present here.
The Court in ASARCO was concerned with the lack of exercise of control. In the subject case, there is evidence of the exercise of control by IP over CIP’s board of directors and its capital expenditures, and officers of CIP were formerly officers of IP. In Woolworth, the Court pointed to many facts which indicated the lack of functional integration, centralization of management and economies of scale. In Woolworth, none of the subsidiaries’ officers was a current or former employee of the parent, and there was no flow of business between the parent and the subsidiaries.
There was a substantial flow of business between IP and CIP. These two companies sold goods to each other, and their subsidiaries distributed each other’s goods to third parties. I do not accept IP’s contention that because all business transactions between the two companies were conducted at market rates the “flow of value” requirement is not met. See Exxon, supra, 447 U.S. at 224,100 S.Ct. at 2120. The practice of using “profit centers” is customary among large or complex corporations. Profit centers make it easier to determine whether divisions or subsidiaries are pulling their weight and contributing to profits. The prices charged in no way affected the overall profitability of IP and CIP on a consolidated basis, and this business practice is the same as taking money from one *161 pocket and putting it into another. It is also well established that separate accounting is not determinative of whether a business is unitary. Mobil, supra, 445 US. at 438,100 S.Ct. at 1232.
Container requires that the out-of-state activities of a unitary business be related to its in-state activities in such a way that there is a “sharing or exchange of value not capable of precise identification or measurement — beyond the mere flow of funds arising out of a passive investment.” 463 U.S. at 166, 103 S.Ct. at 2940. From the facts of this case it is apparent that CIP is not a passive investment.[7] The level of IP’s control over CIP, coupled with the number of business dealings between the two companies, must be considered. Not only was there a substantial flow of goods between the two companies, but the distribution and transportation agreements made it possible for both companies to compete in broader markets more efficiently, and thus, constituted economies of scale. IP’s benefits from its relationship with CIP were more than those of a mere investor. On the facts of this case, the sharing or exchange of value requirement has been met.
The IP-CIP issue is highly fact sensitive and the relationship is more factually similar to Container than ASARCO or Woolworth; therefore, IP and CIP should be treated as a unitary business.
IV.

Are International Paper and C.R. Bard Unitary?

IP iterates many of the same arguments it used for CIP with regard to the issue of whether Bard and IP constitute a unitary *162 enterprise. IP also argues that the small size of the holding and the lack of operational expertise preclude a finding of control and that the passive nature of the investment prevents any finding of control or exchange of value beyond the mere flow of funds.
The Director claims that the Bard shares were held by IP as part of its unitary business, relying on IP’s use of the shares as security for IP debentures. The Director cites Silent Hoist, supra, for the proposition that this use makes the shares of Bard owned by IP more than a passive investment.
The facts of Silent Hoist differ from the facts of the subject case. In Silent Hoist, the New Jersey Supreme Court stated:
Here, as noted, and as distinct from the Supreme Court cases in which multinational corporations and their subsidiaries were involved, we are discussing only one corporation, Silent Hoist. It is for this reason that the dividen[d] payor v. dividen[d] recipient test enunciated by the Supreme Court in Mobil, Exxon, Asarco, Woolworth and Container and relied upon by Silent Hoist is not applicable. In those cases the question involved, for the most part, dividends paid from major subsidiaries to their parent. The inquiry was whether the parent, the recipient of the dividend income, controlled the subsidiary, the dividenfd] payor. [100 N.J. at 19, 494 A.2d 775]
The Silent Hoist Court concluded that this single privately-held corporation, controlled by one man and having a single bank account, and without discrete operation of, or separate accounting for, manufacturing, sales, real estate or securities investment, had centralized management and controlled interaction and was closely integrated and run as a unitary business. Id. at 23, 494 A. 2d 775. The proceeds of its securities investment were used as working capital in its manufacturing aspect. Because of this combination of factors, the securities investment was held to be part of the unitary business. The Court points out that it is the combination of factors that it relies on, not “merely [that] income from a subsidiary or a division adds to the richness of the corporation, or that the occasional oversight with respect to capital structure, debt and dividends that a parent gives a subsidiary is enough to establish a unity relationship”. Id. at 21, 494 A.2d 775. The New Jersey Su *163 preme Court distinguished the facts of Silent Hoist from those of ASARCO, Woolworth and Container, and did not purport to overrule those cases. I conclude that Silent Hoist does not hold, as a matter of law, that all securities investments of multi-national corporations, such as International Paper, ASARCO and Woolworth, are unitary.
The facts of the subject case are more like the facts of ASARCO and Woolworth than those of Silent Hoist, and therefore ASARCO and Woolworth govern the subject case, not Silent Hoist. Further, the ASARCO and Woolworth requirement of control was not rescinded by the Court in Container, which cited ASARCO for the proposition that, in addition to “nexus,” a finding of unitariness “also requires that there be some bond of ownership or control uniting the purported ‘unitary business’.” Container, supra, 463 U.S. at 166, 103 S.Ct. at 2940. Resolution of the unitary issue in Mobil, Exxon, ASARCO and Woolworth was based on whether the subsidiary was engaged in a discrete business activity, and the tests included functional integration, centralization of management and economies of scale. The Container Court did not reject these requirements but explained that, in addition to nexus and ownership or control, there must be a concrete relationship between the purported unitary business and in-state activities evidenced by some sharing or exchange of value. Ibid.
The facts in Container differed from those of ASARCO and Woolworth. The facts in ASARCO did not support a unitary business finding “because the partial subsidiaries were not realistically subject to even minimal control by ASARCO and were therefore passive investments.” Id. 463 U.S. at 176, n. 15, 103 S.Ct. at 2946, n. 15. ASARCO, Woolworth and Container make a distinction between active and passive investments and indicate that passive investments are non-unitary. However, the result in Container differs from that in ASARCO and Woolworth because the subsidiaries in ASARCO and Woolworth were discrete businesses and the subsidiaries in *164 Container were functionally integrated. Id. at 179, 103 S. Ct. at 2947.
If Silent Hoist were to be read as broadly as the Director contends, that is, to require a finding of unitariness anytime shares of stock of public corporations held for investment are “capable of being pledged, liquidated or converted to other uses,” all investment income would be deemed to be active, not passive, and there would be no distinction between unitary and non-unitary business activities of multi-national corporations. All dividends and capital gains from the sale of stock of subsidiaries and investments would be active, and there would be no need for the discrete business activities standard set forth in the United States Supreme Court decisions in ASARCO, Woolworth and Container.
Director also relies on footnote 21 in ASARCO to support his argument. That footnote points out that ASARCO had never been required to utilize its stock investments as security for borrowing of working capital, acquiring stock or securities in other companies or to support bond issues. This footnote is included in response to facts set forth in Justice O’Connor’s dissent in ASARCO and is merely a statement of fact, not a holding.
IP’s investment in Bard was not a part of its unitary business because, by their nature, IP and Bard were not unitary and the IP investment in Bard was passive. IP exercised no control over Bard, and these two companies are not in the same line of business. IP acquired the Bard shares incidental to its purchase of another company, and there is no evidence that these shares were held for any reason other than their value as a passive investment. It also appears incidental that Bard was a New Jersey corporation, since the location of Bard played no part in IP’s acquisition of, or the decision to sell, the Bard shares. There was no evidence of centralization of management, functional integration or economies of scale. Bard was clearly a discrete business entity.
The facts of this case differ from Silent Hoist and Bendix. Silent Hoist emphasized the singleness of the entity. Bendix, although dealing with a diverse entity, emphasized the *165 management plan of acquiring and selling businesses to determine functional integration. IP used the Bard shares in connection with its 1971 refinancing plan, which is arguably a sharing of value; however, this was a single incident rather than a system or plan for a common end or result and does not rise to the level of Bendix.
This single incident is not sufficient to cause IP and Bard to be regarded as a unitary business. Fundamental to the unitary concept is the nature of the business activities. If the activities examined are in reality a part of a single business enterprise, the business should be regarded as unitary. If the activities are unrelated and there is no control or sharing of value, they should not be so regarded. The sharing of value must be significant. If IP controlled Bard and, in fact, Bard and IP were operated as an integrated business, then Bard and IP would be considered unitary. A 1971 pledge of the Bard stock alone does not meet this criteria.
I, therefore, find that Bard was not a part of the unitary business of IP and the IP stock ownership in Bard did not have a sufficient relationship to IP’s New Jersey business to permit the capital gain on the sale of the Bard shares to be included in IP’s assets or income subject to tax by New Jersey.
V.

Is the Apportionment Formula Unfair to IP?

IP’s final contention is that the corporation business tax apportionment method, as applied, results in an allocation of net income to New Jersey which is substantially disproportionate to its activities in this State. IP alleges that the Director’s allocation factor is inflated because the three fractions that make up the allocation factor do not include CIP payroll, property and receipts in the denominators. IP argues that when the statutory three-part formula is applied to large amounts of non-operating income, the taxable amount becomes increasingly disproportionate to the amount of its generative sources. Although IP’s argument may have initial appeal, it loses relevance when *166 one considers that it is the income of the parent, not the subsidiary, that is being apportioned. This is particularly true when dealing with capital-gain income of the parent, not the subsidiary, although it is also pertinent with respect to dividend income of the parent, in part because New Jersey excludes from the parent’s income 100% of dividends from 80% or more owned subsidiaries and excludes 50% of dividends from less than 80% owned subsidiaries.
IP argues that adding CIP payroll, property and receipts to the denominators of the fractions of the allocation formula would reduce the Director’s 1981 allocation factor from .011231 to .009410, which would result in IP paying tax on a lesser amount of allocable net income in New Jersey. Taxpayer alleges that failure to include the CIP factors in the denominators is unfair.
When an allocation factor, as applied, has an unfair result, the Director has the authority, pursuant to N.J.S.A. 54:10A-8, to adjust the allocation factor. This provision for adjustment does not require that the allocation be unconstitutionally unfair, F. W. Woolworth Co. v. Taxation Div. Director, 45 N.J. 466, 497, 213 A. 2d 1 (1965). It is designed “to avoid perceived unfairness or inequity in the application of apportionment formulas which, perhaps, [does] not attain constitutional proportions.” Hess Realty Corp. v. Taxation Div. Director, 10 N.J.Tax 63, 81-82 (Tax a.1988).
Hess Realty, following the standard set forth in Woolworth, found unfair an allocation which resulted in an effective tax rate of over 24%[8] instead of the usual tax rate of 9%. IP’s allegation that it would pay a lesser tax if CIP factors were included in the denominator is insufficient to establish unfairness. The unfairness that IP alleges does not reach the level of that found inequitable by the court in Hess Realty. Further, *167 the statutory allocation formula allocates only 1.1231% of IP’s business to New Jersey. Taxpayer’s contended changes to this formula would reduce this allocation to 0.9410%, a difference of less than lk of 1% of entire net income.
The taxpayer has the burden of proving that the unfairness reaches the level of “substantial inequity.” Id. at 87, 88, citing Woolworth, 45 N.J. at 497, 213 A.2d 1. In Woolworth, the New Jersey Supreme Court held substantially inequitable an allocation formula which took into account only the receipts and not the property or payroll of foreign subsidiaries where income from those foreign subsidiaries represented almost half the entire net income of the parent and where assets of those subsidiaries represented more than half the parent’s entire net worth. In the subject case, CIP only accounts for approximately 20% of IP’s total sales.
IP has the burden of proving that the allocation is “out of all proportion to the business transacted” in New Jersey. Silent Hoist, supra, 100 N.J. at 10, 494 A.2d 775 (quoting Hans Rees Sons, Inc. v. North Carolina ex rel. Maxwell, 283 U.S. 123, 135, 51 S.Ct. 385, 389, 75 L.Ed. 879 (1931). Because this burden has not been met by taxpayer, there is no reason to alter the statutory allocation formula. See Bendix, supra, 10 N.J.Tax at 62.
The Clerk of the Tax Court is directed to enter judgment in favor of the taxpayer on the C.R. Bard issue, and in favor of the Director on the Canadian International Paper and allocation formula issues.

 lncludes newsprint, coated publication paper, uncoated printing, writing and related papers, paper pulp, bristols, chemical cellulose and specialty pulps.

 Includes container board, bleached packaging board, bleached and unbleached industrial papers, and other industrial and consumer packaging products.

 Includes lumber (softwood and hardwood), plywood, wood chips and treated poles.

Includes newsprint, paper pulp, chemical cellulose and specialty pulps. CIP did not produce coated publication paper, uncoated printing or writing paper, or bristols.

 Includes container board and bleached packaging board. CIP did not produce bleached or unbleached industrial papers.

 Includes consumer tissue, disposable diapers and paper napkins.

 The distinction between active and passive investments was addressed in Bendix Corp. v. Taxation Div. Director, 10 N.J.Tax 46 (Tax Ct.1988), aff'd 237 N.J.Super. 328, 568 A.2d 59 (App.Div.1989) (Sup.Ct. app. pend.). Bendix involved the inclusion in allocable income of capital gains from shares of stock held pursuant to a corporate plan or program for the acquisition of businesses. In the subject case the relationship between IP and CIP is an active one involving manufacturing operations, a relationship different from that present in Bendix.

 Calculated as follows:
Director’s income tax assessment entire net income x taxpayer's allocation factor