LASSER, P.J.T.C.
Plaintiff, Mobil Oil Corporation (“Mobil”), seeks review of a final determination by the Director, Division of Taxation (“Director”), with respect to its 1980 corporation business tax return. N.J.S.A. 54:10A-1 et seq. The Director required Mobil to include certain capital gain income in its “adjusted entire net income,” resulting in higher corporation business tax (“CBT”) liability. This capital gain was derived from Mobil’s sale of its 17.9% interest in the Belridge Oil Company (“Belridge”) in connection with the Belridge merger with an indirect subsidiary of Shell Oil Company.
The case was submitted on stipulated facts supplemented by plaintiff with testimony of Mobil employees.
/.

The Facts: Mobil and Belridge.

Mobil is a corporation organized under the laws of the State of New York, and its principal office is in New York. Mobil is a vertically-integrated oil and gas company whose principal business encompasses the exploration for, and the development, production, purchase, transportation and marketing of, crude oil and natural gas, and the purchase, refining, manufacture, transportation and marketing of petroleum and chemical products. A multinational corporation, Mobil is authorized to and transacts business in all fifty states and the District of Columbia. Mobil has a refinery, a corporate office and some 210 gasoline stations in New Jersey.
Mobil excluded the sum of $647,905,091 on its 1980 CBT returns when computing its “adjusted entire net income” under N.J.S.A. 54:10A-4(k). This amount represented the capital gain *346 realized by Mobil upon the sale of the 178,111 shares of capital stock of Belridge.
Belridge was organized under the laws of the State of California as a closely-held corporation and maintained its principal executive offices in Los Angeles, California. On December 10, 1979, Belridge merged with Shellridge Oil Company (“Shell-ridge”), a subsidiary of Shell Oil Company. From its inception until the merger, Belridge was primarily engaged in the production of crude oil and natural gas from properties in the South Belridge oil field of Kern County, California. Belridge was not engaged in the refining, transportation or retail marketing of petroleum products, or oil and gas exploration except for limited exploratory drilling on certain of its properties. All oil and gas production operations and agricultural operations of Belridge were conducted exclusively in Kern County, California.
Prior to the Shellridge-Belridge merger, a majority of the outstanding capital stock of Belridge was owned and controlled by three families. Mobil and Texaco, Inc. held minority interests. General Petroleum Company of California (“GPC”), a wholly-owned subsidiary of Mobil’s predecessor, Socony Vacuum Corporation, acquired beneficial ownership of 169,875 Belridge shares (17.042% of shares outstanding) at various times between 1912 and 1948. In 1959, GPC was merged into Socony Mobil Oil Company (“Socony Mobil”), Mobil’s predecessor. Between 1964 and 1973, Mobil acquired an additional 8,236 Belridge shares. As of the date of the Shellridge-Belridge merger, Mobil held beneficially and of record 178,111 shares (17.9%).
On several occasions prior to 1978, when Mobil learned that certain Belridge family shareholders were interested in selling either the company or their Belridge shares, Mobil conducted internal evaluations of Belridge and assessed the desirability of acquiring Belridge, but no offers were made to acquire Belridge or Belridge shares.
In July 1978, Belridge invited Standard Oil Company of California (“SOCAL”), Mobil and Texaco, Inc. (“Texaco”) to submit bids for the company. Mobil objected to the solicitation *347 of acquisition proposals. Mobil made three alternative proposals, none of which were acted on by Belridge. Belridge then announced a program for soliciting acquisition proposals for the company. Mobil objected to this bidding program.
On July 23, 1979, a majority of the Belridge shareholders, (not including Mobil and Texaco) entered into an agreement which, for a two-year period, prohibited any party from selling Belridge shares without the consent of all parties.
On August 7,1979, Mobil and Texaco submitted to Belridge a joint acquisition proposal. After the proposal was rejected, Mobil commenced legal action to enjoin any sale of Belridge. On September 17, 1979, Mobil and Texaco submitted a joint proposal under which Belridge shareholders would receive $1,787 a share. On September 28, 1979 Belridge accepted a proposal by Shell Oil Company which offered $3,665 a share. Despite Mobil’s opposition, the Belridge merger with Shellridge became effective December 10, 1979. Mobil received $3,665 a share for its shares of Belridge, the proceeds of which were commingled with Mobil’s corporate cash flow and not earmarked for any special purpose.
During the tenure of Mobil’s ownership of Belridge shares, one of the seven members of the Belridge board of directors was a Mobil employee. The Mobil representative attended quarterly board meetings and reported in writing to officers in Mobil’s New York headquarters. By virtue of this board membership, Mobil had access to the following Belridge operating information: drilling plans, capital budgets, cash flow projections, periodic financial statements, periodic production forecasts and results and information regarding sales of crude to third parties and acquisition interests. However, there was substantial testimony that all of this information was readily available through other channels.
By virtue of Socony Mobil’s merger with GPC, Mobil acquired various fee and leasehold interests in oil and gas properties located in the South Belridge oil fields. Thereafter, Mobil acquired additional interests in the South Belridge field. Cer *348 tain of Mobil’s oil- and gas-producing properties in the South Belridge Field were adjacent to, and shared common boundaries with, certain of the oil- and gas-producing properties of Belridge and overlaid parts of the same geological formations which extended under those Belridge properties. However, the recovery methods used by the two companies in the same field varied.[1]
From 1960 to 1976, Belridge sold virtually all of its crude oil production exclusively to SOCAL and SOCAL’s wholly-owned subsidiary, Chevron U.S.A., Inc. Beginning in 1976, Belridge sold an increasing portion of its production to other refiners. Although Mobil made offers to purchase crude oil from Belridge, these offers were refused, and there were no purchases of crude oil by Mobil from Belridge or by Belridge from Mobil.
Belridge granted Mobil five rights of way across its properties so that Mobil could lay pipelines and power lines to service Mobil’s oil and gas properties. However, there was testimony that it is customary in the oil industry for oil companies to grant rights of way to other oil companies without consideration.
There was no centralized management or purchasing, and no financial assistance was provided by one party to the other. Neither party provided advice or rendered services to the other. There were no common officers, employees or management and no transfers of personnel between the parties. There were no shared administrative functions or facilities. Mobil and Belridge did not use any of the same patents. Each had its own separate recruiting and training policies, union agreements, law firms, accounting firms, and pension and other employee benefit and welfare plans. Mobil did not control Belridge or any of its operations. At no time during Mobil’s ownership of Bel *349 ridge shares did Mobil use those shares as security for working capital or for any other credit purpose.

II.

The Unitary Business Requirement.

The Due Process and Commerce Clauses of the United States Constitution prohibit a state from taxing value earned outside its borders. Asarco, Inc. v. Idaho State Tax Commission, 458 U.S. 307, 315, 102 S.Ct. 3103, 3108, 73 L.Ed.2d 787, 794 (1982). Thus, New Jersey has adopted an apportionment formula to tax only its share of the income from a business enterprise. See N.J.S.A. 54:10A-6. The United States Supreme Court has upheld such an allocation method, provided the taxing state tax only income of the enterprise having a “ ‘minimal connection’ or ‘nexus’ between the interstate activities and the taxing state, and a ‘rational relationship between the income attributed to the state and the intrastate values of the enterprise.’ ” Container Corp. of America v. Franchise Tax Board, 463 U.S. 159, 166-167, 103 S.Ct. 2933, 2940-2941, 77 L.Ed.2d 545, 553 (1983).
The determinative issue is whether the business enterprise is unitary. The unitary business issue has been considered several times recently by the United States Supreme Court. See Mobil Oil Corp. v. Commissioner of Taxes, 445 U.S. 425, 100 S.Ct. 1223, 63 L.Ed.2d 510 (1980); Exxon Corp. v. Wisconsin Dept, of Revenue, 447 U.S. 207, 100 S.Ct. 2109, 65 L.Ed.2d 66 (1980); Asarco, supra; F.W. Woolworth v. Taxation & Rev. Dept., 458 U.S. 354, 102 S.Ct. 3128, 73 L.Ed.2d 819 (1982); Container, supra. The issue has been more recently addressed by New Jersey courts. See Silent Hoist & Crane v. Taxation Div. Director, 100 N.J. 1, 494 A.2d 775 (1985); Bendix Corp. v. Taxation Div. Director, 237 N.J.Super. 328, 568 A.2d 59 (App.Div.1989) (Sup.Ct. appeal pending); International Paper Co. v. Taxation Div. Director, 11 N.J.Tax 147 (Tax Ct.1990) (App.Div. appeal pending). A discussion of the United States Supreme Court decisions is included in these opinions and need not be repeated.
*350 Silent Hoist involved a New York corporation with its principal place of business and manufacturing plant in New York. It sold cranes, and owned two commercial properties, in New Jersey. The New Jersey Supreme Court held that taxpayer’s passive investment, real estate and sales income were included in its unitary business and thus were taxable by New Jersey.
In Bendix, the Appellate Division affirmed a Tax Court opinion holding that Bendix was required to include in its entire net income the capital gains and interest earned from its sale of its 20.6% interest in Asarco, Inc. and 100% interest in United Geophysical Corporation. Bendix was a large multinational corporation involved in a variety of businesses. The Appellate Division relied on Bendix’s long-range acquisition policy and history of acquisitions to find that “Bendix’s unitary business included implementation of this policy of acquiring interests in diverse industries to achieve goals of growth, cyclical protection and corporate balance.” Bendix, supra, 237 N.J.Super. at 341-342, 568 A.2d 59.
In International Paper, the Tax Court held that International Paper (IP) was required to include in its apportionable income the capital gain and interest earned on the sale of its wholly-owned subsidiary, Canadian International Paper (CIP), but that IP was not required to include capital gain income realized on the sale of its 14.4% interest in C.R. Bard, Inc. (Bard). The court relied on its findings that IP and CIP were functionally integrated and that IP lacked the necessary control of its Bard investment. The court rejected an argument based on Silent Hoist that an investment need only be “capable of being pledged, liquidated or converted to other uses” to be considered an active investment and therefore unitary. International Paper, supra, 11 N.J.Tax at 163-164.

III.

Are Mobil and Belridge Unitary?

Mobil argues that its investment in Belridge is passive, lacking a sufficient unitary business relationship. In support, *351 Mobil points out that it had only a 17.9% interest and did not control Belridge, which was in reality controlled by three families with a more than 50% interest, and that this lack of control is further evidenced by Mobil’s involuntary sale of its shares. Mobil also claims that there was no functional integration or other transfers of value between the two corporations, and discounts any exchanges of information and the granting of rights of way as commonplace within the industry. Mobil claims that Belridge is a discrete business enterprise and that, therefore, Mobil’s investment in Belridge should not be considered part of Mobil’s unitary business.
Mobil seeks to distinguish the facts of the subject case from Silent Hoist and Bendix. Mobil argues that it had no overall acquisition strategy and that its evaluation of Belridge as a possible acquisition was in response to Belridge’s request for bids, not part of its own deliberate plan. Mobil also points out that its original acquisition of Belridge shares was not intentional, and that the shares were never used as security.
The Director argues that Mobil’s investment in Belridge was active and part of its unitary business. The Director refers to the fact that Mobil and Belridge were in the same business and their oil fields shared a common boundary. The Director asserts that Mobil managed its investment in Belridge by evaluations and attendance at board of directors’ meetings, and that Mobil benefited from the information concerning Belridge operations which it received from its employee who was a member of the Belridge board of directors. The Director also argues that Mobil’s retention of the Belridge shares was part of its overall corporate strategy to acquire proven oil and gas reserves and that, therefore, this case is similar to Bendix. The Director distinguishes the subject case from International Paper on the basis that Bard and IP were not in the same line of business. Finally, the Director argues that there were significant transfers of value between Belridge and Mobil, as evidenced by a sharing of information, the granting of rights of way, and the possibility that Mobil indirectly obtained Belridge crude oil.
*352 I find that Mobil’s investment in Belridge is factually similar to International Paper’s investment in Bard. Mobil and Belridge were not functionally integrated. There was no centralization of management, no economies of scale and no sharing of value. Belridge was a discrete business enterprise.
The subject case is also distinguishable from Silent Hoist and Bendix. As noted in International Paper, Silent Hoist involved a “single privately-held corporation, controlled by one man and having a single bank account, and without discrete operation of or separate accounting for manufacturing, sales, real estate or securities investment [having] centralized management and controlled interaction.” International Paper, supra, 11 N.J.Tax at 162. Further, Silent Hoist distinguished itself from cases involving multinational corporations. Silent Hoist, supra, 100 N.J. at 19, 494 A.2d 775.
Finally, I find that the subject case does not rise to the level of Bendix. There is no evidence that Mobil acquired or sold its Belridge shares as part of an overall acquisition strategy. To the contrary, Mobil’s divestment of Belridge stock was involuntary. Unlike Bendix, Mobil was not in the business of buying and selling businesses.

IV.

Conclusion.

I, therefore, conclude that Belridge was not part of the unitary business of Mobil. The gain on the sale of Mobil’s Belridge shares should not be included in its income apportionable to New Jersey.[2] The Clerk of the Tax Court is directed to enter judgment in favor of Mobil.

 Mobil recovered heavy crude from the Tulare zone using in situ combustion, cyclic-steaming and continuous-steam injection. Mobil recovered lighter crude from the Diatomite/Reef Ridge zone using primary recovery methods. Belridge used a pilot steam injection program for recovery in the Tulare zone, and used hydraulic fracturing to recover lighter crude from the Diatomite/Reef Ridge zone.

 The conclusion of the court herein does not reflect the consensus of the Tax Court judges. See dissents in International Paper Co. v. Taxation Div. Director, 11 N.J.Tax 147 (Tax Ct.1990) (App.Div. appeal pending).