CRABTREE, J.T.C.
This is a corporation business tax case wherein plaintiff, American Home Products Corporation (sometimes referred to herein as AHPC), seeks review of defendant’s determinations that: (1) dividend and capital gain income on its minority shareholdings in four publicly-traded corporations and all the interest income earned by AHPC in its investments in certain short-term securities are includible in AHPC’s entire net income in accordance with N.J.S.A. 54:10A-4(k) and -5(c) for tax years 1979 through 1981 and (2) the value of those dividend paying and interest-bearing investment securities is includible in AHPC’s net worth in accordance with N.J.S.A. 54:10A-4(d) and -5(a) for tax year 1981.
The precise issue in this case is whether any part of the investments and the income therefrom may be apportioned to New Jersey pursuant to N.J.S.A. 54:10A-6.
I.

Basic Facts.

AHPC, a Delaware corporation, maintains its principal office and corporate headquarters in New York City. AHPC’s business operations are multi-state and multi-national in scope, encompassing over 25 states, including New Jersey and numerous foreign countries.
The principal business of AHPC and its subsidiaries is the manufacture and marketing of prescription drugs, medical supplies, packaged medicines, food, household products and housewares. During the years in issue its business activities in New Jersey consisted of manufacturing and distribution from plants in Cranford and Hammonton, and distribution from warehouses in South Plainfield, Secaucus and Linden. AHPC also maintained administrative and accounting offices in South Plainfield, Cranford and Hammonton and sales offices in Westmont, South Plainfield, Cherry Hill and Secaucus.
*291 During the years in issue, AHPC held investments in shares of stock of publicly-traded corporations (public equity investment securities) and in certificates of deposit, commercial paper, United States obligations, municipal bonds and obligations evidenced by repurchase agreements (public interest-bearing investment securities).[1] The issuers of the public equity investment securities were B.F. Goodrich Co. (Goodrich), William Wrigley, Jr. Company (Wrigley), Becton, Dickinson & Co. (Becton Dickinson) and Holt Lloyd International, Ltd. (Holt Lloyd) (collectively, the public dividend payors). The public interest-bearing investment securities were short-term in nature[2] and consisted primarily of commercial paper and certificates of deposit issued by the nation’s largest banks and bank holding companies.
The investment securities, together with the interest, dividend and capital gain income earned thereon, were managed and controlled by AHPC from its New York corporate headquarters.
Neither the investment securities nor the income therefrom were ever used by AHPC as security for borrowing, working or operating capital or for any other indebtedness. During the years in issue AHPC had no significant funded (i.e., long-term) debt. Such funded debt as did exist had been assumed by AHPC in connection with acquisitions in 1965, 1969 and 1976.[3]
AHPC does not maintain separate segregated bank accounts for its investment income. All corporate funds are deposited and commingled in its general corporate account maintained with Manufacturers Hanover Trust Co. The funds so deposited *292 and commingled included income from the public equity investment securities, income from the public interest-bearing investment securities not otherwise reinvested in such securities, the excess of the operating income of AHPC’s 15 divisions over their respective operating and other anticipated expenses, dividends from AHPC’s subsidiaries and rental income from AHPC’s corporate headquarters building. From that account AHPC pays dividends, all expenses of its New York administrative division and certain expenses attributable to all of its divisions such as taxes, legal fees, general insurance and group insurance.
AHPC classifies the operations of its New York corporate headquarters for internal financial reporting purposes as the administrative division. The principal officers of AHPC, including its chairman, president, vice-presidents, comptroller, secretary and treasurer, are located at corporate headquarters and are part of that division. Approximately 400 employees are assigned to the administrative division, which includes the departments of engineering, tax, employee benefits, management information systems, personnel, law, budget and building management. The division also includes the treasurer’s office, the comptroller’s office and corporate executive offices. The budget department consolidates divisional budgets for purposes of preparing a company-wide budget. The salaries of AHPC’s officers and of the personnel in the various administrative division departments are paid by that division, as are various corporate tax obligations and general corporate expenses. The division is also responsible for preparation of patent applications, federal and state tax returns, combined financial statements and annual reports to shareholders.
Each of AHPC’s operating divisions is assessed its proportionate share of executive salaries and other administrative services performed by the administrative division. Those assessments are made through inter-company accounts and are computed on the basis of the ratio of the gross profit of each operating division to company-wide gross profit.
*293 II.

Public Equity Investment Securities.

The shares of common stock held by AHPC in each of the public dividend payors, expressed as a percentage of the number of common shares outstanding, were as follows:
[[Image here]]
The dividend and capital gain income from those share holdings were as follows for the years in issue:
[[Image here]]
* Includes $38,818 capital gain
** Includes $2,810,044 capital gain
The shareholdings of AHPC in both Goodrich and Holt Lloyd were of long standing and had been acquired not by purchase but in connection with business combinations. Goodrich shares were acquired in 1950 as part of the consideration paid to AHPC in connection with the sale of one of the latter’s subsidiaries to Goodrich. The Holt Lloyd shares were held by DupliColor Products Co., Inc. when that company was acquired by AHPC in 1969. AHPC has purchased no additional shares in either Goodrich or Holt Lloyd since those initial acquisitions, although the number of shares held by AHPC in each of those companies has increased as a result of stock splits.
*294 The Wrigley shares were also acquired well before the years in issue, having been purchased on the open market in 1972 and 1973. AHPC has made no additional purchases of Wrigley shares since the initial acquisitions, although the number of its Wrigley shares has since increased as the result of a stock split in 1980.
The shares held by AHPC in Becton Dickinson were acquired through open-market purchases commencing in late 1979. At that time AHPC hoped to acquire additional Becton Dickinson shares with a view to eventual control of the company. AHPC’s management believed that the medical supply and health care business of Becton Dickinson complemented AHPC’s health products business. As a result of Becton Dickinson’s expressed lack of interest in being acquired, AHPC made no further purchases of Becton Dickinson shares. AHPC sold its Becton Dickinson shares in August and September 1980.
There were no transfers of personnel, goods, services or any other property between AHPC and any of the public dividend payors; nor was there any functional integration between their respective business operations or any centralization of their respective managements. AHPC and the public dividend payors neither provided to each other nor shared any corporate or administrative services such as purchasing, advertising, legal or accounting services, data processing, tax return preparation, banking, insurance or employee benefit plans. AHPC at no time controlled, or had the right or power to control, the operations or management of any public dividend payor. Nor did AHPC or any of the public dividend payors make loans or otherwise provide financial assistance to the other.
With but two exceptions, AHPC and the public dividend payors had no common directors, officers or employees. William F. LaPorte, Chairman of the Board of AHPC, was also a Director of B.F. Goodrich Co. from April 17, 1978 to April 16, 1984; William Wrigley, President, Chief Executive Officer and *295 a Director of William Wrigley, Jr. Company has also been a Director of AHPC since 1981.
AHPC had no formal or written investment policy regarding the public equity investment securities or any other equity investments.
III.

Public Interest-Bearing Investment Securities.

The largest percentage of public interest-bearing securities held by AHPC during the years in issue consisted of certificates of deposit issued by the largest banks nationwide. With few exceptions AHPC held those securities less than one year. AHPC’s holding periods for the balance of its public interest-bearing securities were of shorter duration. Commercial paper was held for less than six months; United States Treasury notes were held for periods ranging from 4 to 53 days; corporate repurchase agreements were held for periods ranging from 1 to 3 days; and municipal bonds were held for terms ranging from 9 to 301 days.
AHPC’s public interest-bearing securities, given their short-term durations, were classified as “current assets” and, within that category, as “cash and cash equivalents” on its balance sheets. During the period 1975-1984 AHPC’s cash and cash equivalents ranged from $307,578,000 in 1975 to $767,980,000 in 1984. The average year-end balance in that account during the years in issue exceeded $605,000,000. Of the increase in cash and cash equivalents from 1979 to 1981 approximately two-thirds was attributable to the increased earnings of AHPC’s 15 operating divisions and one-third was attributable to the income earned on its public interest-bearing securities.
Volatile interest rates were the rule during the years in issue and this circumstance, conjoined with AHPC’s conservative investment policy, dictated that excess cash be invested only in the most secure investments and then only on a short-term basis.
AHPC maintained substantial average weekly balances of principal invested in public interest-bearing securities during *296 the period 1976-1984, ranging from $306,800,000 in 1976 to $615,300,000 in 1984. The average weekly balances so invested during the years in issue were $419,000,000 in 1979, $501,290,-000 in 1980 and $642,500,000 in 1981.
The excess cash generated by AHPC from operations and its investment securities was used for a variety of purposes including corporate acquisitions, research and development expenditures, dividends, taxes and administrative and other general corporate expenses. However, neither the public interest-bearing investment securities nor the investment income earned thereon were used by AHPC as security for borrowing working capital or for any other indebtedness. Nor was all of AHPC’s excess cash needed or in fact used to provide operating capital for its business operations. To the contrary, AHPC maintained intact throughout the period 1976-1984 weekly balances of principal invested in public interest-bearing investment securities ranging from $264,600,000 in 1976 to $458,700,000 in 1984. For the years in issue the lowest weekly balances so maintained were $345,000,000 for 1979, $416,500,000 for 1980 and $560,-500,000 for 1981. The average weekly balance so maintained during the years in issue exceeded $440,000,000. The income earned on the public interest-bearing securities was $45,447,096 in 1979, $65,437,181 in 1980 and $100,190,981 in 1981.
The short-term investment portfolio of AHPC, although formally within the treasurer’s responsibility, was administered almost exclusively by AHPC’s portfolio manager. Subject to certain broad policy constraints set by members of the AHPC finance committee, the portfolio manager was free to determine the maturity distribution and securities mix of AHPC’s short-term investment portfolio. Although the treasurer and the portfolio manager consulted on a day-to-day basis concerning rates and proposed investments, neither had any daily contact with members of the finance committee concerning the details of AHPC’s short-term investment activities. Nor did any senior corporate officer or any member of the finance committee participate in the investment of AHPC’s excess cash.
*297 Although the treasurer consulted with the vice-president-finance concerning investments generally, the latter devoted less than one hour a month to the supervision of AHPC’s public interest-bearing investment securities. Indeed, the treasurer himself devoted less than one hour a week to that task. Similarly, although the vice-president-finance discussed investment policies generally with AHPC’s chairman, he did not seek the latter’s approval of AHPC’s investment activities.
The investment policy of AHPC concerning excess cash, including the income earned by the public interest-bearing investment securities, is formulated and proposed by the treasurer and submitted to the vice-president-finance for his approval. If he approves, the short-term investment policy proposal is submitted to one or more members of the finance committee for their approval.
The finance committee qua committee neither acts on those policy proposals nor supervises, exercises control over, or prescribes ratios regarding the composition of AHPC’s short-term securities portfolio or the specific securities included therein. Only the broad policy contours of the short-term investment activities are addressed such as the short-term nature of the investments; the categories of banks and bank holding companies from which certificates of deposit and commercial paper can be purchased; and the maximum dollar amounts that may be invested in any one financial institution.
The day-to-day purchase and sale of public interest-bearing securities remains the exclusive responsibility of the portfolio manager.
IV.

Principles of Law.

A.

Background.

 It is axiomatic that the Due Process and Commerce Clauses of the United States Constitution prohibit state taxa *298 tion of value earned outside the taxing states’ borders. Butler Bros. v. McColgan, 315 U.S. 501, 62 S.Ct. 701, 86 L.Ed. 991 (1942); ASARCO, Inc. v. Idaho State Tax Commission, 458 U.S. 307, 102 S.Ct. 3103, 73 L.Ed.2d 787 (1982). The initial due process requirement for a state’s taxing scheme is that the state must have given something for which it can ask a return. Wisconsin v. J.C. Penney Co., 311 U.S. 435, 61 S.Ct. 246, 85 L.Ed. 267 (1940). More specifically, no tax may be imposed unless (1) there is some minimal connection — a nexus — between the taxpayer’s out-of-state activities and the taxing state and (2) the income attributed to the state for tax purposes is rationally related to values connected with the taxing state. Moorman Manufacturing Co. v. Bair, 437 U.S. 267, 98 S.Ct. 2340, 57 L.Ed.2d 197 (1978); Exxon Corp. v. Wisconsin Dept, of Revenue, 447 U.S. 207, 100 S.Ct. 2109, 65 L.Ed.2d 66 (1980).
What has been described as the “linchpin of apportionability” in the field of state taxation of multi-state businesses is the unitary business principle. Mobil Oil Corp. v. Commissioner of Taxes of Vermont, 445 U.S. 425, 439, 100 S.Ct. 1223, 1232, 63 L.Ed.2d 510 (1980); Exxon Corp. v. Wisconsin Dept, of Revenue, supra, 447 U.S. at 223,100 S.Ct. at 2120. The phrase “unitary business” eludes definition; none of the numerous decisions in both state and federal courts undertakes to define the phrase. It appears to be a make-weight judicially applied when a court has concluded that disputed items of income, and the capital producing it, are somehow functionally related to the in-state activities of the corporate recipient and owner of the capital. To put it in the Moorman context, the income (and capital) are rationally related to values connected with the taxing state, so that the income and capital in dispute which are allegedly beyond the taxing state’s jurisdiction, are includible in the relevant tax base and apportionable to the taxing state pursuant to an apportionment formula, which, in New Jersey and many other states, is a three-factor formula of property, payroll and sales. See N.J.S.A. 54:10A-6.
The functional meaning of the rational relation test set out in Moorman and its progeny is that there be some sharing or *299 exchange of value not capable of precise identification or measurement — beyond the mere flow of funds arising out of a passive investment — which renders formula apportionment a reasonable method of taxation. Container Corporation of America v. Franchise Tax Board, 463 US. 159, 166, 103 S.Ct. 2938, 2940, 77 L.Ed.2d 545 (1983), reh’g den. 464 US. 909, 104 S. Ct. 265, 78 L.Ed.2d 248 (1983). In Container the Court applied the exchange of value principle in upholding apportionability of dividends from controlled foreign subsidiaries. The sharing or exchange of value was represented by loans and guarantees which the taxpayer provided to its subsidiaries, the taxpayer’s involvement in some of its subsidiaries’ managerial decisions and the taxpayer’s training of its subsidiaries’ personnel. These facts were construed as evidence of a functionally integrated enterprise. 463 U.S. at 179-180, 103 S. Ct. at 2947-48. See Brooks, “Worldwide Combination Upheld at Cost to the Commerce Clause” 2 J. State Tax’n, 293, 304 (1984). The sharing or exchange of value in Bendix Corp. v. Taxation Div. Director, 10 N.J.Tax 46 (Tax Ct.1988) aff’d 237 N.J.Super. 328, 568 A.2d 59 (App.Div.1989) was represented by Bendix’ purchase of shares in Asarco, a step in the implementation of the taxpayer’s strategy of international diversified growth. As those shares were thus part of a functionally integrated enterprise and not a mere passive investment the dividend and capital gain income realized therefrom represented unitary business income subject to apportionment in New Jersey.
In Internat’l Paper Co. v. Taxation Div. Director, 11 N.J. Tax 147 (Tax Ct.1990) the relationship between the taxpayer and its wholly-owned subsidiary, Canadian International Paper Company, indicated a sharing or exchange of value in many areas, such as the taxpayer’s control over the subsidiary’s Board of Directors and its capital expenditures, the substantial flow of business between the two corporations, and their joint ability to compete more efficiently in broader markets. This court concluded that the taxpayer’s benefits from its relationship with its subsidiary were more than those of a mere investor, and that the business conducted by the taxpayer and *300 its wholly-owned subsidiary was unitary. Thus, the court found that capital gain realized upon the sale of taxpayer’s shares in Canadian International Paper Company was income subject to apportionment.
B.

The Public Equity Investment Securities.

United States Supreme Court decisions dealing with apportionability of income from multi-state businesses have involved substantial investments in other corporations engaged in the same or similar business. The Mobil and Exxon cases, cited above, involve vertical combinations of functionally integrated world-wide petroleum enterprises, conducted through wholly-owned subsidiaries, which, in the aggregate, performed the integrated functions of exploration, production, transportation, refining, distribution and marketing of petroleum products. The Supreme Court upheld apportionability of dividends from those subsidiaries on the ground that the parent corporation and the subsidiaries were engaged in a unitary business, and that whether the subsidiaries operated as branches or separate legal entities should not affect due process analysis. 445 U.S. at 439, 100 S.Ct. at 1232; 447 U.S. at 218, 100 S.Ct. at 2117. See generally W. Hellerstein, “State Income Taxation of Multi-jurisdictional Corporations: Reflections on Mobil, Exxon, and H.R. 5076,” 79 Mich.L.Rev. 113 (1980). The cases of ASARCO v. Idaho State Tax Commission, supra and F.W. Woolworth Co. v. Taxation and Rev. Dept., 458 U.S. 354, 102 S.Ct. 3128, 73 L.Ed.2d 819 (1982) involved the apportionability of dividends from corporations engaged in the same line of business as the taxpayer. In ASARCO, Idaho sought to include in the taxpayer’s apportionable tax base dividend income from five subsidiaries, in which ASARCO owned between 34% and 53% of the outstanding common stock. The Supreme Court denied apportionability on the ground that the subsidiaries were all discrete business enterprises having nothing to do with ASARCO’s activities in Idaho. The Court observed that the *301 taxpayer exercised no control over the subsidiaries; it also concluded that intercompany transactions were an insufficient demonstration of functionally integrated enterprises.
In Woolworth, New Mexico sought to include dividends from four wholly-owned or controlled subsidiaries in the apportionable tax base. The subsidiaries were engaged in the same line of business as Woolworth. The Court found that there was no functional integration, no centralized management and no evidence of economies of scale, all of these factors being relevant to a state’s right to tax dividends from foreign subsidiaries. The Court went on to conclude that the subsidiaries were separate, independent businesses and denied apportionment.
The most recent United States Supreme Court case in the development of the unitary business concept is Container Corporation of America v. Franchise Tax Board, supra, in which the court indicated that two factors of particular significance were the flow of capital resources from the taxpayer to its controlled foreign subsidiaries through loans and loan guarantees and the managerial role played by the taxpayer in its subsidiaries’ affairs. The existence of these and other factors led the Court to conclude that there was a “sharing or exchange of value not capable of precise identification or measurement — beyond the mere flow of funds arising out of a passive investment or a distinct business operation — which renders formula apportionment a reasonable method of taxation.” 463 U.S. at 166, 103 S.Ct. at 2940.
The facts of this case bring it clearly within the ambit of ASARCO and Woolworth. There were no transfers of personnel, goods, services or other property between AHPC and any of the dividend payors; nor was there any functional integration between their respective business operations or any centralization of their respective managements. AHPC and the public dividend payors neither provided to each other nor shared any corporate or administrative services such as purchasing, advertising, legal or accounting services, data processing, tax return preparation, banking, insurance or employee *302 benefit plans. AHPC at no time controlled the operations or management of any public dividend payor. Indeed, it is difficult to envision the possibility of control given the minuscule percentage of stock ownership in each of the public dividend payors. Neither AHPC nor any of the public dividend payors made loans or otherwise provided financial assistance to the other.
With but two exceptions AHPC and the public dividend payors had no common directors, officers or employees.
Defendant argues that AHPC’s equity investments were not discrete business activities, that they contributed to AHPC’s active business operations. Defendant points to the commingling of capital gains and dividend income in plaintiff’s single bank account at Manufacturers’ Hanover, which, defendant claims, served for all the operational aspects of plaintiff’s business. In further support of his argument, defendant asserts that, as with the management of short-term interest bearing obligations, plaintiff’s stock investments in the four publicly-traded corporations were linked by common ownership, common management and common use with AHPC’s operating divisions. Defendant cites Silent Hoist & Crane v. Taxation Div. Director, 100 N.J. 1, 494 A.2d 775 (1985) in support of his views.
Leaving aside Silent Hoist for the moment, it appears that defendant’s argument is the same as that advanced by Idaho in ASARCO, namely, that intangible income should be considered a part of a unitary business if the intangible property (the shares of stock) is acquired, managed or disposed of for purposes relating to or contributing to the taxpayer’s business. The United States Supreme Court rejected this argument in unequivocal terms:
This definition of unitary business would destroy the concept. The business of a corporation requires that it earn money to continue operations and to provide a return on its invested capital. Consequently all of its operations, including any investment made, in some sense can be said to be “for purposes related to or contributing to the [corporation’s] business.” When pressed to its logical limit, this conception of the “unitary business” limitation becomes no limitation *303 at all. When less ambitious interpretations are employed, the result is simply arbitrary. [458 U.S. at 326, 102 S.Ct. at 3114]
Defendant’s argument about the commingling of funds was rejected in Woolworth, where the Court observed:
The hearing examiner and the New Mexico Supreme Court also thought it significant that Woolworth had commingled its dividends with its general funds and has used them for general corporate operating purposes ... This analysis likewise subverts the unitary-business limitation. All dividend income — irrespective of whether it is generated by a “discrete business enterprise, ’’Mobil, 445 U.S. at 439, 100 S.Ct. at 1232 — would become part of a unitary business if the test were whether the corporation commingled dividends from other corporations, whether subsidiaries or not. [458 U.S. at 364, n. 11, 102 S.Ct. at 3135, n. 11; emphasis supplied]
Defendant argues further that the unitary nature of plaintiff’s stock investments in three of the public corporations is demonstrated by the clear relationship between the business activities of those corporations and plaintiff’s business operations. The simple answer to this contention is that the United States Supreme Court in ASARCO and Woolworth found that the parent and its subsidiaries in each case operated discrete business enterprises even though they were all engaged in the same business and that, as the court had previously recognized in Mobil, due process precluded apportionment where the business activities of the dividend payor had nothing to do with the activities of the payee in the taxing state. As the Supreme Court declared in ASARCO:
We cannot accept, consistently with recognized due process standards, a definition of “unitary business” that would permit nondomieiliary States to apportion and tax dividends ‘[w]here the business activities of the dividend payor have nothing to do with the activities of the recipient in the taxing State....’ [citation omitted] In such a situation, it is not true that ‘the state has given anything for which it can ask return’.... [458 U.S. at 327-328, 102 S.Ct. at 3115],
c.

Public Interest Bearing Investment Securities.

The cases of ASARCO, Woolworth and Container, as well as Exxon and Mobil, were concerned with the operational relationships among the parent and subsidiary corporations in each case and, thus, the business of the subsidiaries and the *304 degree of control exercised by the parent were significant factors in the Court’s determination of the unitary business issue.
Another dimension is involved, however, and that is the functional relationship of the dividend and, where applicable, the capital gain income to the taxpayer’s business, irrespective of the nature of the paying corporation’s business. As the Supreme Court observed in Container, capital transactions can serve either an investment function or an operational function, citing Corn Products Refining Co. v. Comm’r, 350 U.S. 46, 76 S.Ct. 20,100 L.Ed. 29 (1955), 463 U.S. at 180, n. 19, 103 S.Ct. at 2948 n. 19. Indeed, one commentator has suggested that Com Products might contain the appropriate test, i.e., whether the transaction in question was a passive investment or whether it served an operational function. See Dexter, “The Unitary-Business Principle Revisited: Restrictions on its Use,” 8 J. State Tax’n 205, 213 (1989). As this court observed in Bendix v. Taxation Div. Director, supra, “The unitary business question is resolved, ... by examining taxpayers’ activities in managing the investment, not the nature of the activities of the subject of the investment....” 10 N.J. Tax at 59.
Aside from the commingling of interest income from the public interest-bearing securities and dividend and capital gain income from the equity securities in the headquarters bank account with net operating income from plaintiff’s 15 divisions, there is no indication that either the capital or the income generated by AHPC’s investments in equity and debt securities was employed in AHPC’s manufacturing business beyond a minimal amount applied to operational needs. Throughout the period 1975-1984 plaintiff’s year-end cash and cash equivalents account balances consistently exceeded $300,000,000, attaining a high of $767,980,000 in 1984. During the years 1979 through 1981 the average year-end balances in that account exceeded $605,000,000. Given the volatile interest rates prevalent in those years and plaintiff’s conservative investment policy, all excess cash was invested only in the most secure issues and then only on a short-term basis. Consistent with that policy, *305 AHPC maintains substantial investments in public interest-bearing investment securities with average weekly balances of principal ranging from over $300,000,000 in 1976 to over $600,-000,000 in 1984. The average weekly balances of principal so invested during the years 1979-1981 were $419,000,000 in 1979, $501,209,000 in 1980 and $642,500,000 in 1981.
Throughout this same extensive period, AHPC had no significant funded debt. Its operating subsidiaries and divisions were largely profitable and financially self-sufficient, requiring little or no funding from AHPC’s corporate headquarters operation. Thus, notwithstanding AHPC’s use of its extensive “cash and cash equivalents” for a variety of corporate purposes (such as corporate acquisitions, research and development, dividends, taxes and administrative expenses), substantial excess cash remained. Throughout the period 1976-1984, AHPC maintained intact weekly balances of principal invested in public interest-bearing investment securities ranging from over $264,-000,000 in 1976 to more than $560,000,000 in 1981. The average weekly balances so maintained during the three years in issue alone exceeded $440,000,000.
At no time during the period in issue were either the public interest-bearing investment securities or the income earned therefrom used by AHPC as security for borrowing, working or operating capital or for any other indebtedness. Indeed, since such excess cash remained so invested and intact throughout this period, it necessarily follows that AHPC had sufficient cash flow from its business operations to provide the necessary operating capital for all its business operations and other reasonably anticipated needs without reliance upon the cash flow from those investment securities.
State court decisions have recognized that income from investment of surplus funds in short-term securities is part of the taxpayer’s unitary business where the surplus funds so invested and the income earned thereon are used routinely for such general business purposes as cash flow needs, expansion or debt retirement, Comptroller v. NCR Corp., 71 Md.App. *306 116, 524 A.2d 93 (Ct.App.1987), aff 'd 313 Md. 118, 544 A.2d 764 (Ct.Spec.App.1988) and to fund day-to-day operations where the taxpayer had a negative cash position. 544 A.2d at 774. In Sperry & Hutchinson Company v. Dept, of Rev., 270 Or. 329, 527 P.2d 729 (Sup.Ct.1974) the court held apportionable income from short-term securities held to satisfy the taxpayer’s needs for liquid capital in its stamp business. The court also held, however, that the corporation’s long-term investment income and income from short-term securities held pending favorable developments in long-term money markets were not apportionable as part of the corporation’s unitary business.
In the instant case, plaintiff concedes that a portion of the balance in its cash and cash equivalents accounts are apportionable as part of its unitary income. Plaintiff calculates the taxable portion of its short-term investment portfolio and the income therefrom by ascertaining the difference between the average weekly balance and the lowest weekly balance and then determining the percentage relationship between the difference and the average weekly balance. The calculation is illustrated in the following manner:
[[Image here]]
*307 This formulation of taxable working capital was accepted by the Ohio Supreme Court in American Home Products Corp. v. Limbach, 49 Ohio St.3d 158, 551 N.EM 201 (Sup.Ct.1990), in which case the court declared:
We hold that AHP’s manufacturing, warehousing, and selling in Ohio established a minimal connection with Ohio. AHP’s use of some of the accumulated funds in its interstate business re-established a nexus because AHP spent the money to foster its interstate business, of which Ohio was a part. However, AHP’s proven lack of need for the amount in excess of operational capital or to secure loans of working capital broke the nexus again. Thus, AHP established that no rational relationship existed between this excess amount and its Ohio business. Consequently, we hold that Ohio may not constitutionally apportion and then tax the disputed investment income. [551 N.E.2d at 203]
This court accepts plaintiff’s formulation of the taxable portion of its cash and cash equivalents accounts for the three years in issue. To the extent of the lowest weekly balance of principal invested in public interest-bearing investment securities for each of the tax years, those sums, together with the income earned thereon, were not actually used by plaintiff in its business operations and thus were not related in any way to its business activities in New Jersey. The only relationship between AHPC’s business operations and its out-of-state investment activities is “the mere flow of funds arising out of a passive investment” and, for that reason, cannot be “unitary.” Container Corp., supra, 463 U.S. at 166, 103 S.Ct. at 2940.
AHPC did not maintain separate, segregated bank accounts for its investment income, including dividend and capital gain income. Defendant points to this commingling as an indicium of apportionability. As indicated above, however, the United States Supreme Court held in Wool-worth that commingling of investment income with general operational funds in the same bank account is not relevant to the determination of apportionability of such investment income.
D.

Impact of Silent Hoist & Crane Case.

In Silent Hoist & Crane v. Taxation Div. Director, supra, heavily relied upon by defendant, the New Jersey Supreme *308 Court addressed the inclusion of a New York corporation’s portfolio income in its apportioned income base for New Jersey corporate tax purposes. The Court concluded that the income in question was apportionable. The case involved a single, privately-held corporation, controlled by one man and having a single bank account that covered all the corporation’s activities. Receipts from all sources were deposited in that account. There was no discrete operation of or separate accounting for manufacturing, sales, rental income or securities investments. The Court found that the corporation had centralized management and was closely integrated and run as a unitary business. The proceeds of its securities investments were used as working capital in its manufacturing operations.
The facts of the instant case are distinguishable from the facts in Silent Hoist. Unlike Silent Hoist, which involved a single employee who exercised control over all the taxpayer’s business operations, AHPC had a portfolio manager whose sole responsibility was management of the investment portfolio. In Silent Hoist, the corporation maintained but one bank account in which funds from all sources (sales, rental income and investment income) were deposited. AHPC had 15 operating divisions, which deposited the net income from their respective operations in the corporate account at Manufacturers’ Hanover. The divisions thus paid their own operating expenses separately. The only expenses paid from the Manufacturers’ Hanover account were dividends, taxes, expenses allocable to the headquarters’ division and other expenses common to the corporation as a whole. Unlike Silent Hoist, a one-man operation, AHPC was a large corporate bureaucracy with financial management responsibility diffused among the treasurer, comptroller, vice-president-finance and the finance committee.
Defendant argues for a functional, operational relationship between plaintiff’s investment income and its primary business activities. He contends that the investment income and the capital from which it arose are apportionable simply because the funds used to acquire the investments came from general business operations and that the short-term investment was a *309 routine corporate function and a prudent way of managing plaintiffs cash. Defendant asserts, further, that the three unities test articulated by the New Jersey Supreme Court in Silent Hoist, apply to support apportionability of the investments in this case. The unities referred to are ownership (activities both inside and outside the tax jurisdiction are owned by the same taxpayer), operation (a centralized executive structure with central purchasing, advertising, accounting and management) and use (a centralized executive force and a general system of operations). 100 N.J. at 18-19, 494 A.2d 775.
What this court said in Internat’l Paper Co. v. Taxation Div. Director, supra, applies with equal force to the investment income from both equity and debt securities in this case:
If Silent Hoist were to be read as broadly as the Director contends, that is, to require a finding of unitariness anytime shares of stock of public corporations held for investment are “capable of being pledged, liquidated or converted to other use”, all investment income would be deemed to be active, not passive, and there would be no distinction between unitary and non-unitary business activities of multi-national corporations. All dividends and capital gains from the sale of stock of subsidiaries and investments would be active, and there would be no need for the discrete business activities standard set forth in the United States Supreme Court decisions in ASARCO, Woolworth and Container. [11 N.J.Tax at 164]
V.

Conclusion.

This court concludes that the dividend and capital gain income included by defendant in plaintiffs apportionable income base for all years in issue are non-apportionable to New Jersey.[4] Likewise, the value of the shareholdings from which such income was derived is not includible in plaintiffs apportionable net worth base for 1981.
The income from plaintiffs public interest-bearing investment securities is includible in plaintiffs apportionable income *310 base only to the extent of 17.6611% thereof for 1979, 16.9144% thereof for 1980 and 12.7626% thereof for 1981. The value of such investment securities is includible in plaintiff’s apportionable net worth base only to the extent of 12.7626% thereof for 1981.
In light of concessions by both parties on other issues, judgment will be entered pursuant to R. 8:9-3.

 Hereinafter, the equity investment securities and the interest-bearing securities will be collectively referred to as the investment securities.

 The securities in question matured in less than one year after issue.

 The total long-term debt, all of its assumed as stated, was less than $4 million during the years in issue. AHPC’s net worth, as disclosed by schedule "B” item 36 of its New Jersey corporation business tax return, exceeded $1,000,000,000 at the end of each year in issue.

The conclusion of the court herein does not reflect the consensus of the Tax Court judges. See dissents in Internat'l Paper Co. v. Taxation Div. Director, 11 N.J.Tax 147 (Tax Ct.1990).