LASSER, J.T.C.
Central National-Gottesman, Inc. (Taxpayer) contests the denial by the Director of the Division of Taxation of Taxpayer’s claims for refund of corporation business taxes for the years 1988, 1989 and 1990. Taxpayer contends that the portion of its income and gain which is derived from investments should not be included in income subject to tax by New Jersey because it is not unitary business income. Taxpayer is a New York corporation having its corporate headquarters during the years at issue in New York City. The corporation engages in two types of activities, (1) *534 investment in publicly held securities and (2) operation of a forest products business consisting of the purchase and sale in bulk of pulp, paper, newsprint and paperboard and the wholesale distribution of printing-grade and writing-grade papers. Prior to 1984 the forest products business was conducted in a number of states and internationally but not in New Jersey. In 1984 Taxpayer purchased all of the stock of Lindenmeyr Paper Corporation (Linden-meyr) a Delaware corporation having its headquarters in Long Island City, New York. Lindenmeyr engaged in the wholesale distribution of printing-grade and writing-grade papers in New York, New Jersey and other states. It filed CBT returns in New Jersey prior to and after its acquisition by Taxpayer in 1984.
In 1987 Taxpayer elected to become a Subchapter S corporation effective for the year 1988. Since a Subchapter S corporation may not have subsidiaries, Lindenmeyr and its subsidiaries were merged into Taxpayer in late 1987. Following the merger, Taxpayer continued its investment activities and pursued its forest products business in the single Subchapter S corporation.

Investment Activities

During the years 1988, 1989 and 1990, Taxpayer held a substantial diversified investment portfolio consisting largely of publicly-traded securities. The value of the security portfolio exceeded $200 million during the period. Net profits from the investment portfolio were approximately $25,689,000 for 1988, $34,672,000 for 1989 and $3,063,000 for 1990. In its portfolio activities Taxpayer was a passive investor. It did not purchase control blocks of stock, nor was it a securities broker or dealer. The securities held were of companies unrelated to Taxpayer and Taxpayer did not participate in the business affairs of the issuers of the securities. Until 1988 Taxpayer employed in-house portfolio managers to make investment decisions, employing approximately twenty persons to conduct its securities investment activities, all of whom were located at its New York headquarters. Some of the employees managed the portfolio and others performed clerical record keeping, transaction verification and preparation of investment *535 activity reports. Beginning in 1988 Taxpayer engaged the services of six or seven independent investment advisors to manage its portfolio. As a result, the number of Taxpayer’s employees engaged in security investment activities decreased to approximately ten who continued to perform investment record keeping functions at its corporate headquarters.

Forest Products Business

During the years in issue Taxpayer’s gross revenues from its forest products business exceeded $1 billion and net profits were approximately $12 million for 1988, $14 million for 1989 and $8 million for 1990. The forest products business employed more than 600 people and had offices and warehouses in a number of states.
In connection with the 1988 Subchapter S merger and restructuring, the forest product business was separated from the investment business and $40 million of capital was allocated to the forest products division on its internal financial statements. Thereafter the forest products division obtained its own financing independent of Taxpayer’s other financial resources. Taxpayer’s forest products division had financing arrangements with four different institutional lenders and had arranged for three different industrial revenue bond issues in New Jersey, Massachusetts and Connecticut to finance the acquisition or construction of warehouse facilities in those states.
Although operated as divisions of the same corporation, Taxpayer has sought to maintain the investment division as a business activity separate from the forest products division. Separate bank accounts and separate books and records were maintained as well as separate computer systems. The staffs of the two divisions were kept separate. The forest products business had its own controller, executives, accounting department, credit department and sales force. The investment division had its own controller, accounting department, clerical employees and portfolio managers. Three or four of the most senior officers performed duties for both divisions. They did not make day-to-day investment decisions but *536 merely reviewed the performance of the portfolio managers. The senior officers’ salaries were allocated between the two divisions. The same employee benefit plans were available to employees of both divisions, but costs were proportionally allocated to the two divisions.
The assets and income of each division were maintained separately. Income from the forest products division was distributed to the shareholders as dividends and not added to the assets of the investment division.
In 1984 there was a permanent transfer of funds from the investment division to the forest products business for.the purchase of Lindenmeyr. Before the Subehapter S merger in late 1987, a small amount of investment portfolio capital was occasionally loaned to the forest products business. In connection with the merger, the forest products division retained $40 million in capital on its books and returned approximately $17 million to the investment division accounts, the decision having been made that the capital of the forest products division would be limited to $40 million.
In 1988 D.F. Munroe Company was purchased with funds of the forest products division. At that time a letter of credit was obtained from Morgan Guarantee Trust to secure payments to an officer, of D.F. Munroe in the amount of $8,425,000 under an employment and non-competition agreement The letter of credit was obtained at a lower cost by permitting Morgan Guarantee to look to a portion of the assets of the investment division held in a Morgan Guarantee custody account in the event of default of the! reimbursement obligation under the agreement and letter of credit. The face amount of the letter of credit represented approximately 4% of the value of the investment portfolio in 1988 and the investment portfolio was never called upon to make any payment relating to this obligation.
In 1988 Taxpayer made charitable contributions of approximately $513,000 in the form of appreciated securities of the investment division, a portion of which were allocated to the forest products division.
*537 Taxpayer’s headquarters functions and employee benefit programs were shared by the investment and forest products divisions, but their books and records reflected their allocable shares of the costs of the shared programs or functions. The senior officers whose compensation was allocated were the president, the general counsel, the treasurer, and the director of human resources.
I.
Taxpayer contends that its investment and forest products divisions are separate and distinct activities combined only for the purpose of complying with the requirements of Subchapter S of the Internal Revenue Code, that the divisions are not functionally integrated and, since there is no nexus between the investment division and the State of New Jersey, and because the activities are not unitary, the income and assets of the investment division are not subject to tax by the State of New Jersey.
Director contends that Taxpayer’s merger with the Lindenmeyr business which conducted business in New Jersey gave Director the authority to determine whether all of Taxpayer’s assets have an operational connection with the activities Taxpayer conducts in New Jersey. Director contends that the operational use of the investment portfolio by the forest products division was continuing, not merely isolated occurrences. Director also asserts that the three-part test of unitary business (ie., functional integration, centralization of management and economies of scale) applies, and that under this test, Taxpayer’s activities evidence a sharing or exchange of value between the investment division and the forest products division that render it unitary.
II.
New Jersey is prohibited by the Due Process and Commerce Clauses of the United States Constitution from imposing an income-based tax on “value earned outside its borders.” ASARCO, Inc. v. Idaho State Tax Comm’n, 458 U.S. 307, 315, 102 S.Ct. 3103, 3108, 73 L.Ed.2d 787, 794 (1982). To avoid such a prohibited *538 tax on a business enterprise operating in more than one state, New Jersey applies an apportionment formula which taxes that portion of the income of the enterprise reflected by fractions in which the property, payroll and receipts in New Jersey are the numerators and property, payroll and receipts everywhere are the denominators.
The average of these fractions is an allocation factor which is applied to certain income of the enterprise. The state may apply this allocation factor to only that income of the enterprise having a “ ‘minimal connection’ or ‘nexus’ between the interstate activities and the taxing state, and a ‘rational relationship between the income attributable to the state and intrastate values of the enterprise.’ ” Container Corp. of America v. Franchise Tax Bd., 463 U.S. 159, 165-66, 103 S.Ct. 2933, 2940, 77 L.Ed.2d 545, 553 (1983) (quoting Exxon Corp. v. Wisconsin Dept. of Revenue, 447 U.S. 207, 219-20, 100 S.Ct. 2109, 2118, 65 L.Ed.2d 66, 79 (1980)).
Many states use such a unitary business/formula apportionment method in lieu of geographic or transactional accounting. Justice Brennan, in Container, supra, stated:
The unitary business/formula apportionment method is a very different approach to the problem of taxing businesses operating in more than one jurisdiction. It rejects geographical or transactional accounting, and instead calculates the local tax base by first defining the scope of the ‘unitary business’ of which the taxed enterprise’s activities in the taxing jurisdiction form one part, and then apportioning the total income of the ‘unitary business’ between the taxing jurisdiction and the rest of the world on the basis of a formula taking into account objective measures of the corporation’s activities within and without the jurisdiction. This court long ago upheld the constitutionality of the unitary business/formula apportionment method, although subject to certain constraints.
[ 463 U.S. at 165, 103 S.Ct. at 2940, 77 L.Ed.2d at 553 (citations omitted). ]
The use of the unitary business/formula apportionment method of identifying income which may be taxed locally initially requires a determination as to whether the enterprise is unitary. The primary issue in this case is whether the investment division and the forest products division can be considered a unitary business.
The unitary concept has been addressed several times by the United States Supreme Court in recent years. See Container *539 Corp. of America v. Franchise Tax Bd., 463 U.S. 159, 103 S.Ct. 2933, 77 L.Ed.2d 545 (1983); F.W. Woolworth Co. v. Taxation & Revenue Dept., 458 U.S. 354, 102 S.Ct. 3128, 73 L.Ed.2d 819 (1982); ASARCO, Inc. v. Idaho State Tax Comm’n, 458 U.S. 307, 102 S.Ct. 3103, 73 L.Ed.2d 787 (1982); Exxon Corp. v. Wisconsin Dep’t of Revenue, 447 U.S. 207, 100 S.Ct. 2109, 65 L.Ed.2d 66 (1980); Mobil Oil Corp. v. Commissioner of Taxes of Vermont, 445 U.S. 425, 100 S.Ct. 1223, 63 L.Ed.2d 510 (1980). However, these cases do not enunciate a single test to determine whether a business is unitary. Silent Hoist & Crane v. Taxation Div. Director, 100 N.J. 1, 494 A.2d 775, cert. denied, 474 U.S. 995, 106 S.Ct. 409, 88 L.Ed.2d 359 (1985). Mobil involved inclusion of dividends received from foreign subsidiaries in Mobil’s tax base for purposes of taxation in Vermont. Mobil, a New York corporation headquartered in New York City, was described as a functionally integrated enterprise conducting an integrated petroleum business. Mobil owned no production facilities or refineries in Vermont. Its activities in that state were limited to the wholesale and retail marketing of petroleum and related products. Relying on the fact that Mobil was an integrated enterprise, the Court held that income from the foreign subsidiaries was properly included in Mobil’s Vermont tax base.
In Exxon, Exxon argued that its business in Wisconsin was limited to the marketing of petroleum products, and therefore should not be taxed on its exploration and production or refining income. Like Mobil, Exxon was a vertically integrated petroleum company incorporated and headquartered outside of the taxing state. The Court rejected Exxon’s argument that separate accounting for each department distinguished this case from Mobil. Exxon, supra, 447 U.S. at 223, 100 S.Ct. at 2120, 65 L.Ed.2d at 81, and held that “Exxon has not carried its burden of showing that its functional departments are ‘discrete business entexprises.’ ” Id. at 224, 100 S.Ct. at 2120, 65 L.Ed.2d at 81.
The unitary principle was limited by the decisions in ASARCO and Woolworth. In ASARCO, Idaho claimed a right to tax a proportionate share of that company’s income derived from five *540 foreign subsidiaries. ASARCO was incorporated in New Jersey and headquartered in New York and its business involved the mining, smelting and refining of various metals. ASARCO’s primary activity in Idaho was the operation of a silver mine which amounted to 2.5% of the company’s total activity. ASARCO owned between 34% and 53% of the shares of the subsidiaries sought to be taxed.
Although these subsidiaries were in the same line of business as ASARCO, the Supreme Court noted that ASARCO did not exercise any control over the foreign subsidiaries and held that they were discrete business enterprises whose activities were not taxable by Idaho. In Woolworth, the Court similarly rejected the inclusion in New Mexico’s tax base of income from four foreign subsidiaries, three of which were wholly owned, which were engaged in the same business as the parent. The holding was based on a factual determination of a lack of functional integration, centralization of management and economies of scale.
The unitary concept was further defined in Container. Container Corporation, a vertically integrated paperboard packaging manufacturer, was a Delaware corporation headquartered in Illinois and doing business in California. The State of California sought to include sales from Container Corporation’s foreign subsidiaries in the three-part allocation formula. These subsidiaries were 66% to 100% owned by Container Corporation and were engaged in essentially the same business. Although Container Corporation did not take an active role in the management of these subsidiaries, the parent generally oversaw the subsidiaries’ operations and there was some overlapping of officers and directors. These factors contributed to the Court’s determination that Container Corporation was a functionally integrated enterprise and that the subsidiaries’ income should be taxed under unitary business principles.
The principles announced in Woolworth were confirmed in Allied-Signal v. Director, Div. of Taxation, 504 U.S. 768, 112 S.Ct. 2251, 119 L.Ed.2d 533 (1992). That case dealt with an investment by Bendix Corporation in the stock of ASARCO Inc. Bendix was *541 a Delaware corporation headquartered in Michigan doing business in all fifty states and twenty-two foreign countries.[1] Its primary operations in New Jersey were development and manufacture of aerospace products. Bendix acquired 20.6% of the stock of AS-ARCO, a New Jersey corporation which had its principal offices in New York and which produced nonferrous metals. After two years, Bendix generated income of $211.5 million by selling the stock back to ASARCO. New Jersey sought to have Bendix taxed for an apportioned amount of income that included in the base the gain from the ASARCO stock sale.
The United States Supreme Court found the two corporations were unrelated enterprises each of whose activities had nothing to do with the other. Even though Bendix had two of the fourteen seats on ASARCO’s board of directors, the Court said Bendix did not exert any control over ASARCO. The Court found that under prior Supreme Court rulings New Jersey did not have the constitutional power to include in Bendix’s tax base the income from the stock sale, where none of the three factors of a unitary business were present.
A corporation may have two divisions which serve separate and distinct purposes. “Investment in a business enterprise truly ‘distinct’ from a corporation’s main fine of business often serves the primary function of diversifying the corporate portfolio and reducing the risks inherent in being tied to one industry’s business cycle.” Container, 463 U.S. at 178, 103 S.Ct. at 2946, 77 L.Ed.2d at 561. The United States Supreme Court observed in Container that capital transactions can serve either an investment function or an operational function (citing Corn Products Refining Co. v. Commissioner, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29 (1955)) Id., *542 463 U.S. at 180, n. 19, 103 S.Ct. at 2948, n. 19, 77 L.Ed.2d at 562, n. 19.
It is not unusual for a division to be devoted to managing investments unrelated to operational divisions and for that investment activity to be other than unitary with the activities of the corporation’s operating divisions. In American Home Products Corp. v. Taxation Div. Director, 11 N.J. Tax 287 (Tax 1990), aff'd o.b. per curiam, 13 N.J.Tax 120 (App.Div.1992) taxpayer, American Home Products Corporation, (AHPC) maintained a division responsible for investing in publicly-held securities and fifteen manufacturing divisions. AHPC, a Delaware corporation, was headquartered in New York, and had offices in New Jersey. The investment securities and their related income were managed by AHPC in New York. New Jersey sought to include the dividend and capital gain from these investments in AHPC’s corporate business tax in New Jersey. This Court found that, despite the commingling of interest and dividend income with net operating income from the manufacturing divisions, there was sufficient cash flow from its business operations to provide the necessary operating capital for its business operations without reliance upon cash flow from investment securities. Id. at 305. The Court concluded that the only relationship between AHPC’s business operations and its out-of-state investment activities was “the mere flow of funds arising out of a passive investment,” and, for that reason, the investment activities were not unitary. Id. at 307 (quoting Container, supra, 463 U.S. at 166, 103 S.Ct. at 2940, 77 L.Ed.2d at 554).
In Allied-Signal the Supreme Court held that “whether in pursuing maximum profits [a corporation] treated particular intangible assets as serving, on the one hand, an investment function, or, on the other, an operational function ____ is the relevant unitary business inquiry, one of which focuses on the objective characteristics of the asset’s use and its relation to the taxpayer and its activities within the taxing-State.” Allied-Signal, 504 U.S. at 785, at 112 S.Ct. at 2262, 119 L.Ed.2d at 550.
III.
The finding of unitariness requires that “there be some bond of ownership or control uniting the purported ‘unitary busi *543 ness.’ ” Container, supra, 463 U.S. at 166, 103 S.Ct. at 2940, 77 L.Ed.2d at 553-54. Resolution of the unitary issue in Mobil, Exxon, ASAECO and Woolworth turned on whether the subsidiary was engaged in a discrete business activity. The Container Court reiterated that a unitary business may exist without a flow of goods between the parent and subsidiary, if instead there is a flow of value between the subsidiaries. Id. at 178, 103 S.Ct. at 2946, 77 L.Ed.2d at 561. Both the three-part test (centralization of management, functional integration and economies of scale) and the flow of value test were reaffirmed by the United States Supreme Court in Allied-Signal, supra.
The facts of the subject case do not indicate a sharing or exchange of value between the forest products division and the investment division. The two divisions operated as separate entities. They each had separate operational officers, controllers and sales forces (or portfolio managers), their businesses were not related in any way and they each maintained separate books, computer systems and bank assets. The forest products division secured its own financing after the Subchapter S formation in 1987.
Director’s contention that the entire corporation including the investment division is unitary, rests on the following:
1. Both divisions had the same four senior officers.
2. Both divisions used the same pension fund and employee benefits program.
3. A common payroll department serviced both divisions.
4. Office space, mailroom and telephone system were shared by both divisions.
5. On one occasion the investment division made a charitable contribution of appreciated securities, a portion of which was allocated to the forest products division.
6. The forest products division returned $17 million to the investment division shortly after a loan of $18 million dollars had been obtained for working capital for the forest products division.
7. The forest products division obtained a lower fee for a letter of credit from Morgan Guarantee because the letter of credit was secured by the assets of the investment division held by Morgan Guarantee.
There do not appear to be significant economies of scale or centralization of management. There is no evidence that the common mailroom, telephone system and payroll department would have been more expensive if operated separately by each *544 division. The cost of these items, as well as the salaries of the senior officers and the office space were allocated to each division proportionally. The senior executives do not make day-to-day investment decisions. The one instance of allocating a portion of Taxpayer’s charitable contribution to the forest products division is incidental. Because these were divisions rather than subsidiaries of Taxpayer, it is not unusual that there are common senior officers, and a common pension fund and employee benefits program. The officers common to both divisions are at the most senior level of the corporation and they provide the type of oversight that any corporation gives to its divisions or subsidiaries. See Woolworth, supra, 458 U.S. at 369, 102 S.Ct. at 3138, 73 L.Ed.2d at 831. Because a corporate structure consists of divisions rather than subsidiaries does not in itself make the corporation unitary.
Director argues that Taxpayer’s acquisition of Lindenmeyr in 1984 with investment division funds, followed by the merger of Lindenmeyr into Taxpayer and the return of $17 million by the forest, products division to the investment division in 1988, functionally joined the investment division to the forest products division in New Jersey. The Lindenmeyr acquisition in 1984 was prior to the merger to the Subchapter S corporation and the years in issue. The return of $17 million from the forest products division to the investment division in 1988 occurred due to the corporate policy, adopted at the time of the merger in late 1987, that the forest products division would operate on a self-financed basis with capital of $40 million. To accomplish this self-financing policy for the forest products division, an $18 million working capital loan was secured from Prudential. The forest products division then returned $17 million to the investment division, the amount in excess of the $40 million capital.
Director relies on a covenant in the Prudential loan which required Taxpayer to maintain a stated tangible net worth and did not distinguish between the forest product division or investment division assets to establish that there is a functional integration of the forest products division and the investment division beginning with the 1984 Lindenmeyr purchase and continuing thereafter.
*545 The forest products division and investment portfolio were conducted as separate activities for several years prior to the years in issue. Each had its own capital allocation on Taxpayer’s books. The Prudential loan was not secured by investment division assets. The Prudential agreement contained a working capital covenant which looked specifically and solely to the assets of the forest products division.
The Lindenmeyr purchase in 1984 and the external financing policy for the forest products division adopted at the time of the Subchapter S merger are separate and unrelated transactions which do not establish a functional integration. For the years in issue the investment division assets were not used to support the forest products division.
As for the letter of credit from Morgan Guarantee for the D.F. Monroe purchase, Taxpayer testified that the letter of credit could have been obtained without such a pledge and that the only benefit the pledge conferred on the forest products division was a de minimis saving of fees.
The Morgan Guarantee letter of credit and the charitable contribution allocation were single incidents. There is no evidence that there was any other use of the investment division assets by the forest products division as Director contends. A single incident is not sufficient to constitute the two divisions a unitary business. See International Paper v. Director, Div. of Taxation, 11 N.J.Tax 147, 165 (1990), aff'd o.b. per curiam 12 N.J.Tax 253 (App.Div.), certif. denied, 127 N.J. 549, 606 A.2d 363 (1991).
I find Taxpayer’s testimony to be credible and that there is no basis for determining that the two divisions were functionally integrated. Beyond the tenuous $17 million repayment link alleged by Director and other incidental activities, there is nothing to functionally integrate the two divisions. They were separate, unrelated business enterprises.
IV.
The structure of Taxpayer is similar to the taxpayer in American Home Products, supra. Both maintained an investment *546 portfolio primarily made up of publicly-traded stocks separate from operational divisions. Both kept separate accounts for each division. Each operating division obtained its own financing and was able to conduct its business operations without reliance upon the income from the investment division. Like the taxpayer in American Home Products, the investment division of Taxpayer in the instant case cannot be found to be part of a unitary business.
There is no evidence, other than management oversight at the very highest level, the common pension plan and employee benefits program, that the two divisions were dependent on each other. Taxpayer has shown by clear and cogent evidence that there was a lack of functional integration, centralization of management and economies of scale between its investment division and forest products division. I conclude that the divisions were not unitary and the portion of Taxpayer’s income that is derived from the investment division is not subject to taxation by New Jersey. Taxpayer is entitled to its claim for refund of corporate business taxes for 1988, 1989 and 1990. Judgment will be entered accordingly.

 This case was entitled Bendix Corp. v. Director, Div. of Taxation, 10 N.J.Tax 46 (Tax 1988) aff'd. 237 N.J.Super. 328, 568 A.2d 59 (App.Div.1989) aff'd 125 N.J. 20, 592 A.2d 536 (1991) in the New Jersey courts. Bendix was acquired by Allied-Signal during the litigation and the petition to the United States Supreme Court was brought by Allied-Signal as successor in interest.